## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) | CASE NO. 23-1231 |
| v. | ) ) ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| Respondent. | ) | |

## <u>PETITION FOR REVIEW</u>

Pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825l(b), Rule 15(a) of the Federal Rules of Appellate Procedure and Circuit Rule 15, Capital Power Corporation, D. E. Shaw Renewable Investments, L.L.C., EDP Renewables North America LLC, Invenergy Renewables LLC, Lightsource Renewable Energy Operations, LLC, National Grid Renewables Development, LLC, NextEra Energy Resources, LLC and RWE Renewables Americas, LLC (Petitioners), hereby petition this Court for review of the following order issued by the Federal Energy Regulatory Commission (Commission), Respondent:

<u>Midcontinent Independent System Operator, Inc.</u>, Docket No. ER23-523-001, "Order Addressing Arguments Raised on Rehearing," 184 FERC ¶ 61,022 (July 12, 2023).

A copy of the order is attached to this filing as Attachment A.  In the July 12, 2023 Order, the Commission denied Petitioners' request for rehearing of a January 27, 2023 FERC order that accepted a tariff filing by the Midcontinent Independent System Operator, Inc. that removed compensation for reactive support as contained in Schedule 2, Reactive Supply and Voltage Control from Generation or Other Sources Service of its Open Access Transmission, Energy and Operating Reserve Markets Tariff.  Petitioners are owners of renewable energy generation and provide reactive support in the Midcontinent Independent System Operator, Inc. and are thereby aggrieved by the Commission's actions in the July 12, 2023 Order.

In Case No. 23-1134 (consolidated with Case Nos. 23-1135 and 23-1136), Petitioners sought review of the January 27, 2023 order and the March 30, 2023 Notice Of Denial Of Rehearing By Operation Of Law And Providing For Further Consideration.  Petitioners hereby submit this Petition for Review of the July 12, 2023 Order and request that this Court consolidated the instant filing with Case Nos. 23-1134, 23-1135, and 23-1136.

Respectfully submitted,

CAPITAL POWER CORPORATION
D. E. SHAW RENEWABLE
INVESTMENTS, L.L.C.,
EDP RENEWABLES NORTH
AMERICA LLC,
INVENERGY RENEWABLES LLC,
LIGHTSOURCE RENEWABLE
ENERGY OPERATIONS, LLC,
NATIONAL GRID RENEWABLES
DEVELOPMENT, LLC,
NEXTERA ENERGY RESOURCES,
LLC, RWE RENEWABLES AMERICAS,
LLC

/s/ Bruce A. Grabow

  Bruce A. Grabow
  Jennifer Brough
  LOCKE LORD LLP
  701 8th Street, N.W., Suite 500
  Washington, DC 20001
  Telephone: (202) 220-6991
  Facsimile: (202) 220-6945
  bgrabow@lockelord.com
  jbrough@lockelord.com

  *Counsel for Petitioners*

Dated:        August 30, 2023

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) |
| Petitioner | ) ) |
| v. | ) ) ) |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) |
| Respondent. | ) |

CASE NO. _____

## CORPORATE DISCLOSURE STATEMENT OF CAPITAL POWER CORPORATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Capital Power Corporation (Capital Power) makes the following disclosures:

1. Capital Power Corporation (Capital Power) is a corporation incorporated under the laws of Canada. Capital Power develops, owns, and operates, through wholly owned or partially owned subsidiaries, utility-scale thermal and renewable generation facilities located throughout Canada and the United States. Capital Power is headquartered in Edmonton, Alberta.

2. All common shares of Capital Power Corporation (TSX ticker: CPC) are publicly held. No entity owns, or controls with power to vote,

10% or more of the outstanding voting securities of Capital Power
Corporation.

Respectfully submitted,

CAPITAL POWER
CORPORATION

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner Capital
Power Corporation*

Dated:      August 30, 2023

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) | |
| | ) | CASE NO. _____ |
| v. | ) ) | |
| | ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| Respondent. | ) | |

## CORPORATE DISCLOSURE STATEMENT OF D. E. SHAW RENEWABLE INVESTMENTS, L.L.C.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, D.E. Shaw Renewable Investments, L.L.C. (D.E. Shaw) makes the following disclosures:

1. The ultimate parent of D. E. Shaw Renewable Investments, L.L.C. is D. E. Shaw & Co., L.P. (DESCO LP). DESCO LP is an Investment Adviser registered with the SEC under the Advisers Act. The general partner of DESCO LP is D. E. Shaw & Co., Inc., and the only owner of more than a 25% direct ownership interest in DESCO LP is Dr. David E. Shaw. Dr. Shaw is also the sole stockholder, chairman, and president of D. E. Shaw & Co., Inc. No publicly held corporation owns 10% or more of its stock.

Respectfully submitted,

D. E. SHAW RENEWABLE
INVESTMENTS, L.L.C.

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner D.E. Shaw Renewable Investments, L.L.C.*

Dated:      August 30, 2023

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) | CASE NO. _____ |
| v. | ) ) ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| Respondent. | ) | |

## CORPORATE DISCLOSURE STATEMENT OF EDP RENEWABLES NORTH AMERICA LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, EDP Renewables North America LLC makes the following disclosures:

1. EDP Renewables North America LLC (EDP Renewables) is a limited liability company organized under the laws of the state of Delaware. EDP Renewables develops, owns, and operates, through wholly owned or partially owned subsidiaries, renewable electric generation facilities located throughout the United States. EDP Renewables' principal office is located at 1501 McKinney Street, Suite 1300, Houston, Texas 77010.

2. EDP Renewables is a wholly owned direct subsidiary of EDP Renováveis, S.A. (EDP Renováveis). Approximately 71.27% of the

share capital of EDP Renováveis is owned by EDP-Energias de Portugal, S.A. (EDPSA), through EDPSA's Spanish branch, EDP – Energias de Portugal, Sociedad Anónima, Sucursal en España. The remaining approximately 29.73% of the issued share capital of EDP Renováveis currently is publicly traded and widely disbursed among investors. None of these investors (together with its affiliates) owns or controls a 10% or greater voting interest in EDP Renováveis.

3. EDPSA is a diversified energy and utility company headquartered in Portugal, the principal subsidiaries of which own or operate assets in various European countries as well as in Brazil, Mexico, Canada and, through EDP Renewables, the United States.

4. China Three Gorges Corporation (CTG) indirectly owns a 20.86% equity interest in EDPSA. Specifically, CWEI (Europe), S.A. (CWEI (Europe)) directly owns 20.86% of EDPSA. CWEI (Europe) is wholly owned by CWEI (Hong Kong) Co. Ltd, which is wholly owned by CWE Investment Co. Ltd., which is wholly owned by CTG. CTG has no representation on EDP Renewables' executive management team.

5. CTG is a wholly state-owned enterprise of the People's Republic of China (PRC) and an independent power producer in China. The entire equity interest in CTG is held by the state-owned Assets Supervision

and Administration Commission, the PRC government agency established by the State Council that supervises the operations of state-owned enterprises within the PRC.

6. The ordinary shares of EDPSA are publicly traded on the Euronext Lisbonne exchange. None of the remaining shareholders of EDPSA (individually or collectively with its affiliates) owns or controls a 10% or greater voting interest in EDPSA.

Respectfully submitted,

EDP RENEWABLES NORTH AMERICA LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner EDP Renewables North America LLC*

Dated:    August 30, 2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) | |
| | ) | CASE NO. _____ |
| v. | ) ) | |
| | ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| Respondent. | ) | |

## CORPORATE DISCLOSURE STATEMENT OF INVENERGY RENEWABLES LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Invenergy Renewables LLC (Invenergy) makes the following disclosures:

1. Invenergy is a limited liability company organized under the laws of the state of Delaware. Invenergy develops, owns and operates renewable generation infrastructure in the United States. Invenergy's principal office is located at One South Wacker Drive, Suite 1800, Chicago, IL 60606.

2. Invenergy is privately held and no publicly held U.S. company has a 10% or greater ownership interest in Invenergy.

Respectfully submitted,

INVENERGY RENEWABLES LLC

<u>/s/ Bruce A. Grabow</u>

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner Invenergy*
*Renewables LLC*

Dated:      August 30, 2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CAPITAL POWER CORPORATION,      )
ET AL.,                          )
                                 )
Petitioner                       )
                                 )     CASE NO. _____
v.                               )
                                 )
                                 )
FEDERAL ENERGY REGULATORY        )
COMMISSION,                      )
                                 )
Respondent.                      )

## CORPORATE DISCLOSURE STATEMENT OF LIGHTSOURCE RENEWABLE ENERGY OPERATIONS, LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Lightsource Renewable Energy Operations, LLC (Lightsource) makes the following disclosures:

1. Lightsource is a limited liability company organized under the laws of the state of Delaware.  Lightsource's principal office is located at 400 Montgomery Street, 8th Floor, San Francisco, CA 94104.

2. Lightsource is a direct, wholly-owned subsidiary of Lightsource Renewable Energy US, LLC.   Ten percent or more of Lightsource Renewable Energy US, LLC is indirectly owned by BP p.l.c., a publicly held corporation.

Respectfully submitted,

LIGHTSOURCE RENEWABLE
ENERGY OPERATIONS, LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner Lightsource*
*Renewable Energy Operations, LLC*

Dated:       August 30, 2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) | |
| | ) | CASE NO. _____ |
| v. | ) ) | |
| | ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) | |
| | ) | |
| Respondent. | ) | |

## CORPORATE DISCLOSURE STATEMENT OF NATIONAL GRID RENEWABLES DEVELOPMENT, LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, National Grid Renewables Development, LLC (NG Renewables) makes the following disclosures:

1. NG Renewables is a Delaware limited liability company that develops and operates utility-scale wind, solar and energy storage projects across the country.

2. NG Renewables is an indirect wholly owned subsidiary of National Grid, plc, a company incorporated in England and Wales that is publicly traded on the New York Stock Exchange.

Respectfully submitted,

NATIONAL GRID RENEWABLES
DEVELOPMENT, LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner National Grid
Renewables Development, LLC*

Dated:      August 30, 2023

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) | |
| | ) | CASE NO. _____ |
| v. | ) ) | |
| | ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| Respondent. | ) | |

## CORPORATE DISCLOSURE STATEMENT OF NEXTERA ENERGY RESOURCES, LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, NextEra Energy Resources, LLC makes the following disclosures:

1. NextEra Energy Resources, LLC ("NEER"), which has a corporate address of 700 Universe Blvd, Juno Beach, Florida 33408, is a wholly-owned subsidiary of NextEra Energy Capital Holdings, Inc. NEER is developing, and owns and operates, renewable energy generating assets throughout the United States, including in the Southwest Power Pool region.

2. NextEra Energy Capital Holdings, Inc. is a wholly-owned subsidiary of NextEra Energy, Inc., a publicly traded company listed on the New York Stock Exchange.  On August 10, 2023, The Vanguard Group,

Inc. ("Vanguard") reported on behalf of its subsidiaries and affiliated investment companies and funds ("Vanguard Entities") that as of June 30, 2023, they held 10.81% of the outstanding shares of NextEra Energy, Inc.  NEER does not have knowledge of the actual number of outstanding shares currently held by the Vanguard Entities, including whether their holdings remain above 10% at this time.

Respectfully submitted,

NEXTERA ENERGY
RESOURCES, LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner NextEra Energy Resources, LLC*

Dated:      August 30, 2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) | |
| | ) | CASE NO. _____ |
| v. | ) ) | |
| | ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) | |
| | ) | |
| Respondent. | ) | |

## CORPORATE DISCLOSURE STATEMENT OF RWE CLEAN ENERGY, LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, RWE Clean Energy, LLC (RWE) makes the following disclosures:

1. RWE is a limited liability company organized under the laws of the state of Delaware. RWE develops, owns, and operates electric generation and storage facilities throughout the United States. RWE's principal office is located at 353 North Clark Street, Floor 30, Chicago, Illinois 60654.

2. RWE is owned 100% by RWE Renewables International Participations BV, which, in turn, is a wholly-owned subsidiary of RWE AG, a German company. No publicly held company owns 10% or more of RWE's stock.

Respectfully submitted,

RWE CLEAN ENERGY, LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner   RWE Clean Energy, LLC*

Dated:     August 30, 2023

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 30, 2023, I served a copy of the foregoing document in accordance with the Federal Rules of Appellate Procedure and the Circuit Rules upon the Solicitor of the Federal Energy Regulatory Commission, 888 First Street NE, Washington, DC 20426 and the Secretary of the Federal Energy Regulatory Commission, 888 First Street NE, Washington, DC 20426 and by U.S. Mail to the parties listed below.

| Party | Served On |
|---|---|
| Ameren Services Company | Matthew Tomc<br>Ameren Corporation<br>1901 Chouteau Ave<br>MC 1310<br>St. Louis, Missouri 63040<br><br>Anne Kilburn Dailey<br>Denice Simpson<br>1331 Pennsylvania Ave, NW<br>Suite 550 South<br>Washington, DC 20004 |
| American Clean Power Association | Gabriel Tabak<br>Jason Burwen<br>American Clean Power Association<br>1501 M Street NW Suite 900<br>Washington, DC 20005 |

| Party | Served On |
|---|---|
| American Electric Power Service Corporation | Stacey Burbure<br>LaChon Turner<br>801 Pennsylvania Avenue, NW<br>Washington, DC 20004-2615 |
| American Municipal Power, Inc. | Lisa McAlister<br>Gerit F. Hull<br>Christopher Norton<br>1111 Schrock Road<br>Suite 100<br>Columbus, OH 43229 |
| AQN Wind Projects | Elizabeth Whittle<br>Nixon Peabody LLP<br>799 9TH Street NW Suite 500<br>Washington, DC 20001 |
| Basin Electric Power Cooperative | Jesse Halpern<br>Nicole Allen<br>Thompson Coburn LLP<br>1909 K Street NW<br>Suite 600<br>Washington, DC 20006<br><br>Jason Doerr<br>Rhonda Starck<br>Matthew Kolling<br>Rebecca Kern<br>Basin Electric Power Cooperative, Inc.<br>1717 E Interstate Avenue<br>Bismarck, North Dakota 58503 |

| Party | Served On |
|-------|-----------|
| Bishop Hill Energy III LLC | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, WI 53203 |
| Calpine Corporation | Sarah Novosel<br>Brett Kruse<br>717 Texas Ave.<br>Suite 1000<br>Houston, Texas 77002 |
| Clean Grid Alliance | Natalie McIntire<br>20 N Wacker Drive, Suite 1600<br>Chicago, Illinois 60606<br><br>Rhonda Peters<br>InterTran Energy Consulting<br>1610 S Valentine Way<br>Lakewood, Colorado 80228 |
| Coalition of Midwest Power Producers, Inc. | Scott Storms<br>5898 Garden Gate Way<br>Suite 300<br>Carmel, Indiana 46033 |

| Party | Served On |
|---|---|
| Coalition of MISO Transmission Customers | Kenneth Stark<br>McNees Wallace & Nurick LLC<br>100 Pine Street<br>Harrisburg, Pennsylvania 17101<br><br>Robert Weishaar<br>Kevin Murray<br>McNees Wallace & Nurick LLC<br>1200 G Street, NW<br>Suite 800<br>Washington, DC 20005 |
| Consumers Energy Company | Deborah Moss<br>Consumers Energy Company<br>1730 Rhode Island Avenue NW<br>Suite 1007<br>Washington, DC 20002<br><br>Rachael Moore<br>1 Energy Plaza Drive<br>Jackson, Michigan 49201 |
| Cordelio Power | Bruce Grabow<br>Locke Lord LLP<br>701 8th Street N.W., Suite 500<br>Washington, DC 20001 |
| Coyote Ridge Wind, LLC | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, Wisconsin 53203 |

| Party | Served On |
|---|---|
| Crossett Solar Energy, LLC | Steven Shparber<br>Omar Bustami<br>Clark Hill PLC<br>1001 Pennsylvania Ave, NW<br>Suite 1300 South<br>Washington, DC 20000 |
| Delta's Edge Solar, LLC | Steven Shparber<br>Omar Bustami<br>Clark Hill PLC<br>1001 Pennsylvania Ave, NW<br>Suite 1300 South<br>Washington, DC 20000 |
| DTE Electric Company | Lauren Donofrio<br>Frank Niscoromni<br>DTE Energy Company<br>1 Energy Plaza<br>Detroit, Michigan 48226 |
| Duke Energy Corporation | Sheri May<br>Duke Energy Corporation<br>139 East Fourth St.<br>Cincinnati, Ohio 45202 |

| Party | Served On |
|---|---|
| Dynegy Marketing and Trade, LLC | David Ricketts<br>Jessica Miller<br>Vistra Corp.<br>1005 Congress Avenue, Suite 750<br>Austin, Texas 78701<br><br>James Quinn<br>Vistra Energy Corp.<br>325 7th St NW<br>Suite 520<br>Washington, DC 20004 |
| EDF Renewables, Inc. | Andrea Wolfman<br>Michael Chase<br>Michael Kunselman<br>Jonathan Namazi<br>Jonathan Trotta<br>Davis Wright Tremaine LLP<br>1301 K Street NW, Suite 500 East<br>Washington, DC 20005 |
| Electric Power Supply Association | Nancy Bagot<br>Vice President<br>Electric Power Supply Association<br>1401 New York Avenue NW Suite 950<br>Washington, DC 20005 |

| Party | Served On |
|-------|-----------|
| Goose Creek Wind, LLC | Margaret Claybour<br>Sharon White<br>Rock Creek Energy Group, LLP<br>1 Thomas Circle NW Suite 700<br>Washington, DC 20005<br><br>Steven Hollingsworth<br>Apex Clean Energy, Inc.<br>310 4th St. NE, Suite 300<br>Charlottesville, Virginia 22902 |
| Great Pathfinder Wind, LLC | Margaret Claybour<br>Sharon White<br>Rock Creek Energy Group, LLP<br>1 Thomas Circle NW Suite 700<br>Washington, DC 20005<br><br>Steven Hollingsworth<br>Apex Clean Energy, Inc.<br>310 4th St. NE, Suite 300<br>Charlottesville, Virginia 22902 |
| Hallador Power Company, LLC | Zori Ferkin<br>King & Spalding LLP<br>1700 Pennsylvania Avenue, NW<br>Suite 200<br>Washington, DC 20006<br><br>Tyler Brown<br>King & Spalding LLP<br>1180 Peachtree Street NE Suite 1600<br>Atlanta, Georgia 30309 |

| Party | Served On |
|---|---|
| Hoosier Energy Rural Electric Cooperative, Inc. | Barry Cohen<br>McCarter & English LLP<br>1301 K Street, N.W.<br>Suite 1000 West<br>Washington, DC 20005 |
| Illinois Commerce Commission | Christine Ericson<br>Illinois Commerce Commission<br>160 N. LaSalle St.<br>Suite C-800<br>Chicago, Illinois 60601<br><br>Katharine McCormick<br>Illinois Commerce Commission<br>160 N. LaSalle N925<br>Chicago, Illinois 60601 |
| Illinois Municipal Electric Agency | Troy Fodor<br>Illinois Municipal Electric Agency<br>3400 Conifer Drive<br>Springfield, Illinois 62711 |
| Indiana Municipal Power Agency | Colten Mitchell<br>Peter J. Prettyman<br>Indiana Municipal Power Agency<br>11610 North College Ave<br>Carmel, Indiana 46032 |

| Party | Served On |
|---|---|
| Indiana Office of Utility Consumer Counselor | Arthur Iler<br>Scott Jones<br>Indiana Office of Utility Consumer Counselor<br>115 W Washington St<br>Ste 1500 South<br>Indianapolis, Indiana 46204 |
| International Transmission Company | Kyle Henne<br>ITC Holdings Corp.<br>601 13th Street NW, Suite 710S<br>Washington, DC 20005 |
| Iowa Association of Municipal Utilities | Stephen Pearson<br>Anree Little<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DC 20006<br><br>Tim J Whipple<br>Ahlers & Cooney P.C.,<br>100 Court Ave, Suite 600<br>Des Moines, Iowa 50309 |
| ITC Midwest LLC | Kyle Henne<br>ITC Holdings Corp.<br>601 13th Street NW, Suite 710S<br>Washington, DC 20005 |

| Party | Served On |
|---|---|
| Ledyard Windpower, LLC | Sheri May<br>Associate General Counsel<br>139 East Fourth St.<br>Cincinnati, Ohio 45202 |
| Louisiana Public Service Commission | Noel Darce<br>Stone Pigman Walther Wittmann L.L.C.<br>909 Poydras St. Suite 3150<br>New Orleans, Louisiana 70112-4042<br><br>Kathryn H Bowman<br>Executive Counsel<br>Louisiana Public Service Commission<br>602 N 5th Street<br>Baton Rouge, Louisiana 70802 |
| LWP Lessee, LLC | Michael Kunselman<br>Jonathan Trotta<br>Michael Chase<br>Jonathan Namazi<br>Davis Wright Tremaine LLP<br>1301 K Street, NW Suite 500 East<br>Washington, DC 20005 |
| Michigan Electric Transmission Company, LLC | Kyle Henne<br>ITC Holdings Corp.<br>601 13th Street NW, Suite 710S<br>Washington, DC 20005 |

| Party | Served On |
|---|---|
| Michigan Public Power Agency | Alan Robbins<br>Debra Roby<br>Thomas Steiger<br>Washington Energy Law LLP<br>900 17th Street NW STE 500-A<br>Washington, DC 20006 |
| Midcontinent Independent System Operator, Inc. | Wendy Reed<br>Wendy Warren<br>Abraham Johns<br>Wright & Talisman, PC<br>1200 G Street, N.W<br>Suite 600<br>Washington, DC 20005<br><br>Amy Thurmond<br>Adriana A Rodriguez<br>Midcontinent Independent System Operator, Inc.<br>720 City Center Drive<br>Carmel, Indiana 46032 |
| Midland Cogeneration Venture Limited Partnership | Michael Rustum<br>Potomac Law Group, PLLC<br>1300 Pennsylvania Ave., Suite 700<br>Washington, DC 20004 |
| Minnesota Public Utilities Commission | Will Seuffert<br>Lauren Bethke<br>Ryan Barlow<br>Hwikwon Ham<br>Minnesota Public Utilities Commission<br>121 7th Place East, Suite 350<br>St. Paul, Minnesota 55101 |

| Party | Served On |
|---|---|
| Missouri Public Service Commission | Rodney Massman<br>Carrie L. Bumgarner<br>Valerie Groose<br>Jennifer Heintz<br>Jennie Wells<br>Dana Sanson<br>Jan Kay Davidson<br>Missouri Public Service Commission<br>200 Madison St.<br>Jefferson City, Missouri 65101<br><br>John D. Borgmeyer<br>Shelley S. Brueggemann<br>Missouri Public Service Commission<br>PO Box 360<br>Jefferson City, Missouri 65109 |
| Missouri River Energy Services | Philip Mone<br>McCarter & English<br>1301 K ST NW<br>Washington, DC 20005<br><br>Richard Dahl<br>John Weber<br>Missouri River Energy Services<br>3729 West Avera Drive<br>Sioux Falls, South Dakota 57108 |
| Mulligan Solar, LLC | Bruce Grabow<br>Locke Lord LLP<br>701 8th St. NW, Suite 500<br>Washington, DC 20001 |

| Party | Served On |
|---|---|
| Natural Resources Defense Council | Elizabeth Pearlman<br>Natural Resources Defense Council<br>20 N Wacker Drive, Suite 1600<br>Chicago, Illinois 60606 |
| Norris Electric Cooperative | Bhaveeta Mody<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street NW Suite 700<br>Washington, DC 20006 |
| NRG Power Marketing LLC | Cortney Slager<br>804 Carnegie Center<br>Princeton, New Jersey 08540<br><br>Neal Fitch<br>Dir. East Regulatory Affairs<br>NRG Energy, Inc.<br>211 Carnegie Center<br>Princeton, New Jersey 08540<br><br>Jennifer Hsia<br>Managing Senior Counsel<br>NRG Energy<br>910 Louisiana Street<br>Houston, Texas 77002 |
| Old Dominion Electric Cooperative | Adrienne Clair<br>Jecoliah R Williams<br>Thompson Coburn LLP<br>1909 K Street NW Suite 600<br>Washington, DC 20006 |

| Party | Served On |
|---|---|
| Organization of MISO States, Inc. | Marcus Hawkins<br>Brad Pope<br>Organization of MISO States, Inc.<br>811 E Washington Ave<br>Suite 400<br>Madison, Wisconsin 53703 |
| Orsted Wind Power North America LLC | Lopa Parikh<br>Orsted North America Inc.<br>1225 New York Ave NW Suite 550B<br>Washington, DC 20005 |
| Pine Gate Renewables, LLC | Brett White<br>Director, Regulatory Affairs<br>Pine Gate Renewables, LLC<br>150 U Street NE<br>Washington, DC 20002 |
| Public Utility Commission of Texas | Alan Robbins<br>Debra Roby<br>Thomas Steiger<br>Washington Energy Law LLP<br>900 17th Street NW STE 500-A<br>Washington, DC 20006<br><br>Jessie Lance<br>Public Utility Commission of Texas<br>PO Box 13326<br>Austin, Texas 78711 |

| Party | Served On |
|---|---|
| Rainbow Energy Center, LLC | Robert Fallon<br>Christina Switzer<br>Engleman Fallon, PLLC<br>1717 K Street NW<br>Washington, DC 20006 |
| Resale Power Group of Iowa | David Crawford<br>Betts & Holt LLP<br>1101 Connecticut Avenue, N.W.<br>Suite 450<br>Washington, DC 20036 |
| Rural Electric Convenience Cooperative Co. | Michael Postar<br>Bhaveeta Mody<br>Linda L. Murray-Kimball<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, N.W., Suite 700 |
| Savion, LLC | Bruce Grabow<br>Locke Lord LLP<br>701 8th Street N.W., Suite 500<br>Washington, DC 20001 |
| Shell Energy North America (US), L.P. | Sean Chang<br>Director, Regulatory Affairs<br>Shell Energy North America (US), L.P.<br>1000 Main Street<br>Houston, Texas 77002 |

| Party | Served On |
|---|---|
| Solar Energy Industries Association | Melissa Alfano<br>Ben Norris<br>Solar Energy Industries Association<br>1425 K Street, N.W., Suite 1000<br>Washington, DC 20005 |
| Southwestern Electric Cooperative, Inc | Michael Postar<br>Bhaveeta Mody<br>Linda L. Murray-Kimball<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, N.W., Suite 700<br>Washington, DC 20006 |
| Sustainable FERC Project | John Moore<br>Senior Attorney<br>Sustainable FERC Project<br>2 N Riverside Plaza Suite 2250<br>Chicago, Illinois 60606-2640 |
| Tatanka Ridge Wind, LLC | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, WI 53203 |
| Upper Michigan Energy Resources Corporation | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, WI 53203 |

| Party | Served On |
|---|---|
| Vistra Corp. | David Ricketts<br>Jessica Miller<br>Vistra Corp.<br>1005 Congress Avenue, Suite 750<br>Austin, Texas 78701<br><br>James Quinn<br>Vistra Energy Corp.<br>325 7th St NW<br>Suite 520<br>Washington, DC 20004 |
| Wabash Valley Power Association, Inc. | Randolph Holt<br>General Counsel<br>6702 Intech Boulevard<br>Indianapolis, Indiana 46278<br><br>Jeremy L. Fetty<br>Parr Richey LLP<br>251 N Illinois Street Suite 1800<br>Indianapolis, Indiana 46204 |
| Whiting Clean Energy, Inc. | Betsy Carr<br>BP Energy Company<br>201 Helios Way<br>Houston, Texas 77079<br><br>Laura L Sigward<br>Whiting Clean Energy, Inc.<br>2155 Standard Ave<br>Whiting, Indiana  46394 |

| Party | Served On |
|---|---|
| Wisconsin Electric Power Company | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, WI 53203 |
| Wisconsin Public Service Corporation | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, WI 53203 |
| Wolverine Power Supply Cooperative, Inc. | Michael Rustum<br>Partner<br>Potomac Law Group, PLLC<br>1300 Pennsylvania Ave., Suite 700<br>Washington, DC 20004 |

Respectfully submitted,
/s/ Bruce A. Grabow
Bruce A. Grabow

**ATTACHMENT A – FERC ORDER**

184 FERC ¶ 61,022
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
                       James P. Danly, Allison Clements,
                       and Mark C. Christie.

Midcontinent Independent System Operator, Inc.          Docket No.  ER23-523-001

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued July 12, 2023)

1.      On January 27, 2023, the Commission issued an order[1] accepting proposed revisions, pursuant to section 205 of the Federal Power Act (FPA),[2] to Schedule 2, Reactive Supply and Voltage Control from Generation or Other Sources Service of Midcontinent Independent System Operator, Inc.'s (MISO) Open Access Transmission, Energy and Operating Reserve Markets Tariff (Tariff).  MISO, on behalf of the MISO Transmission Owners (MISO TO),[3] proposed to eliminate all charges under Schedule 2 for the provision of reactive power within the standard power factor range (Reactive Service)[4] from MISO TOs' own and affiliated generation resources.  Consistent with the

---

[1] *Midcontinent Indep. Sys. Operator, Inc.*, 182 FERC ¶ 61,033 (2023) (Reactive Power Order).

[2] 16 U.S.C. § 824d.

[3] MISO TOs include:  Ameren Services Company, as agent for Union Electric Company, Ameren Illinois Company, and Ameren Transmission Company of Illinois; Arkansas Electric Cooperative Corporation; City Water, Light & Power (Springfield, IL); Cooperative Energy; Dairyland Power Cooperative; East Texas Electric Cooperative; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy Texas, Inc.; Great River Energy; Indianapolis Power & Light Company; Lafayette Utilities System; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Missouri River Energy Services; Montana-Dakota Utilities Co.; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, Inc.; Southern Indiana Gas & Electric Company; and Southern Minnesota Municipal Power Agency.

[4] Capitalized terms used but not otherwise defined in this order have the meanings ascribed to them in the Tariff.  "Standard power factor range" refers to the power factor

Commission's "comparability standard," MISO TOs also proposed to terminate the obligation under Schedule 2 to pay unaffiliated generation resources in MISO for Reactive Service.

2.      Requests for rehearing were filed by:  (1) Vistra Corp., Dynegy Marketing and Trade, LLC, and the Coalition of Midwest Power Producers, Inc. (collectively, Vistra); (2) Wolverine Power Supply Cooperative, Inc. (Wolverine); (3) Orsted Wind Power North America, LLC (Orsted); (4) Sugar Creek Wind One LLC, Deerfield Wind Energy, LLC, Deerfield Wind Energy 2, LLC, and Odell Wind Farm, LLC (collectively, AQN Wind); (5) the American Clean Power Association, the Solar Energy Industries Association, the Sustainable FERC Project, and the Natural Resources Defense Council (collectively, Clean Energy Advocates); (6) Rainbow Energy Center, LLC (REC); and (7) Capital Power Corporation, D. E. Shaw Renewable Investments, L.L.C., EDP Renewables North America LLC, Invenergy Renewables LLC, Lightsource Renewable Energy Operations, LLC, National Grid Renewables Development, LLC, NextEra Energy Resources, LLC, and RWE Renewables Americas, LLC (collectively, Clean Energy Generation Owners).

3.      Pursuant to *Allegheny Defense Project v. FERC*,[5] the rehearing requests filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 313(a) of the FPA,[6] we are modifying the discussion in the Reactive Power Order and continue to reach the same result in this proceeding, as discussed below.[7]

---

range required for interconnection and set forth in the interconnecting generator's generator interconnection agreement (GIA).  MISO's *pro forma* GIA prescribes a power factor range of 0.95 leading to 0.95 lagging.  This range is also sometimes referred to as the "deadband."

[5] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[6] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[7] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the Reactive Power Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

## I.    **Background**

4.      MISO TOs proposed revisions to Schedule 2 of the Tariff to terminate compensation for Reactive Service for MISO TOs' own and affiliated generation resources.[8]  Under the "comparability standard" articulated in Order Nos. 2003 and 2003-A,[9] which requires that interconnecting generators be compensated for Reactive Service if the transmission provider pays its own or affiliated generators for such power,[10] MISO TOs also proposed revisions to terminate the obligation to compensate unaffiliated generation resources.[11]  MISO TOs argued that the Commission had approved similar proposals.[12]  MISO TOs further asserted that the proposed revisions to Schedule 2 would not impact reliability because new and existing generators would still be required to have the capability to provide Reactive Service as a condition of interconnection and MISO will maintain its ability to manually redispatch individual generators for voltage control.[13]  MISO TOs requested waiver of the Commission's 60-day prior notice requirement to allow an effective date of December 1, 2022.[14]

5.      The Commission accepted MISO TOs' proposed Schedule 2 revisions, effective December 1, 2022, finding that the revisions were just and reasonable and not unduly discriminatory or preferential.[15]  The Commission concluded the proposed Schedule 2

---

[8] Reactive Power Order, 182 FERC ¶ 61,033 at P 4.

[9] *Standardization of Generator Interconnection Agreements & Procs.*, Order No. 2003, 104 FERC ¶ 61,103 (2003), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007).

[10] Reactive Power Order, 182 FERC ¶ 61,033 at P 3.

[11] *Id.* P 4.

[12] Transmittal at 6-7 (citing *Pub. Serv. Co. of N.M.*, 178 FERC ¶ 61,088, at PP 29-31 (2022) (*PNM*); *Nev. Power Co.*, 179 FERC ¶ 61,103, at PP 20-21 (2022) (*Nevada Power*) and arguing that, if the proposed revisions were accepted, MISO would have a reactive power regime similar to the California Independent System Operator Corporation (CAISO)).

[13] *Id.* at 2, 9.

[14] *Id.* at 11.

[15] Reactive Power Order, 182 FERC ¶ 61,033 at P 52.

revisions were permitted under and consistent with Order Nos. 2003 and 2003-A which articulated the comparability standard.[16]  The Commission explained that "Order Nos. 2003 and 2003-A do not mandate that once a transmission provider compensates its own or affiliated generators it may never discontinue such compensation and must, as a result, always compensate unaffiliated generators," and that Commission precedent allowed transmission providers to discontinue such compensation for all generators.[17]  The Commission found that protests challenging these well-established principles were impermissible collateral attacks on these earlier determinations.[18]

6.    The Commission rejected the arguments raised by protestors asserting that MISO TOs' proposal was not just and reasonable.  As to protestors' claims that they have come to rely on compensation for Reactive Service, the Commission noted that it had previously rejected such arguments and that "by designing their generating facilities to have the capability to provide reactive support [within the standard power factor range], interconnecting generators are meeting the conditions of interconnection required of all generators and as a general matter are not entitled to compensation" except as required by the comparability standard.[19]  The Commission also disagreed with protestors' arguments that eliminating reactive power compensation within the standard power factor range would impact system reliability.[20]  The Commission further rejected protestors' arguments that MISO TOs' proposal was distinguishable from, and therefore not supported by, Commission precedent.[21]

7.    The Commission was also not persuaded by protestors' arguments that MISO TOs' proposal violated the comparability standard by affording a competitive advantage to MISO TOs' own generation based on the possibility that they may recover their lost

---

[16] *Id.*; *see also id.* P 53.

[17] *Id.* (citing *PNM*, 178 FERC ¶ 61,088 at P 29; *Nevada Power*, 179 FERC ¶ 61,103 at P 20; *Bonneville Power Admin. v. Puget Sound Energy, Inc.*, 120 FERC ¶ 61,211, at P 20 (2007) (*Bonneville*), *order on reh'g*, 125 FERC ¶ 61,273 (2008) (Bonneville Order on Rehearing); *E.ON U.S. LLC*, 119 FERC ¶ 61,340, at P 15 (2007) (*E.ON*); *Entergy Servs., Inc.*, 113 FERC ¶ 61,040, at P 38 (2005)).

[18] *Id.*

[19] *Id.* P 54.

[20] *Id.* P 55.

[21] *Id.* PP 56-57.

reactive power revenue through their retail rates.[22]  The Commission explained that it had already rejected this argument in other decisions, that eliminating compensation for both affiliated and non-affiliated generators treated all generators on a comparable basis, and that both affiliated and unaffiliated generators would have the opportunity to recover lost revenue from the elimination of Schedule 2 compensation through other means—none of which were guaranteed.[23]  Relatedly, the Commission rejected arguments that MISO TOs were required to demonstrate that they had removed generation plant investment associated with the production of reactive power from their retail sales rates as beyond the scope of the proceeding and not within the Commission's jurisdiction.[24]

8.      Nor was the Commission persuaded by Vistra's arguments that MISO TOs' proposal violated the Takings Clause and Due Process Clause of the Fifth Amendment to the United States Constitution.[25]  The Commission explained that the provision of Reactive Service is an obligation of interconnection that should not receive compensation (unless necessary to meet the comparability standard) and such reactive power is necessary for a generator to sell and deliver its real power.

9.      The Commission rejected arguments that MISO TOs lacked authority to file their proposal under FPA section 205 or that the filing could not terminate reactive power compensation within the standard power factor range for independent power producers. The Commission concluded that the filing was permissible in light of section 9.6.3 of the MISO *pro forma* Generator Interconnection Agreement (GIA), which provides that Reactive Service compensation shall be pursuant to a rate schedule filed by the transmission provider, and Appendix K of the Agreement of Transmission Facilities Owners to Organize the MISO, A Delaware Non-Stock Corporation (MISO TO Agreement), which provides a mechanism through which MISO and MISO TOs may

---

[22] *Id.* P 58.

[23] *Id.* (noting comparability did not require the Commission to guarantee recovery of reactive power costs within the deadband and that independent power producers could seek to recover their lost revenue through higher power sales rates); *see also id.* P 60 (finding protestors' reliance on *FPC v. Conway Corp.*, 426 U.S. 271 (1976) (*Conway*) unpersuasive for similar reasons); *id.* P 61.

[24] *Id.* P 59 (noting that "protesters fail to adequately explain how the revenue requirements associated with the provision of Reactive Service are being recovered through the transmission owner's bundled retail rates, allowing them to still benefit from a substantial reactive power revenue stream, and why the elimination of compensation for Schedule 2 Reactive Service requires changes to transmission owners' retail rates").

[25] *Id.* P 62.

make FPA section 205 filings like the one before the Commission.[26]  The Commission further rejected arguments that MISO TOs had not met certain requirements attendant to making such a filing, including that MISO TOs had failed to identify the entities comprising the majority of transmission owners who voted in favor of the filing.[27]

10.    Finally, the Commission rejected arguments that MISO TOs' proposal undercut independent power producers' FPA section 205 filing rights and that MISO TOs were, instead, required to make FPA section 206 filings.[28]  The Commission explained that MISO's *pro forma* GIA entitles interconnection customers "to compensation for reactive power consistent with the rates set forth in any tariff or rate schedule filed by transmission provider and approved by the Commission—in this case, Schedule 2. Under MISO TOs' proposal, Schedule 2 rates will be set to zero."[29]  As a result, the Commission found that MISO TOs' proposal, while terminating separate compensation for all generators for Reactive Service, "addresses only the rates chargeable to transmission customers under Schedule 2 and by extension, payable to resources consistent with their GIAs."[30]  The Commission concluded that MISO TOs' proposal does not address "any independent right of generators to seek compensation under FPA section 205."[31]

## II.   **Requests for Rehearing**

11.    Certain parties dispute the Reactive Power Order on general principles, contending that separate compensation for Reactive Service is required based on cost causation principles or in order to ensure that generators can recover their costs.[32]  In this vein,

---

[26] *Id.* P 63.

[27] *Id.* P 64; *see also id.* P 66.

[28] *Id.* PP 65-66; *see* 16 U.S.C. § 824e.

[29] Reactive Power Order, 182 FERC ¶ 61,033 at P 65.

[30] *Id.*

[31] *Id.*; *see also id.* P 66 (rejecting REC's argument that payments for reactive power should continue, notwithstanding the changes to Schedule 2, until an FPA section 206 filing is made to eliminate REC's reactive power rate schedule).

[32] *See, e.g.*, Vistra Rehearing Request at 7-9 (arguing that "public utilities must be given an opportunity to recover their costs, plus a reasonable rate of return"); *id.* at 10-11; REC Rehearing Request at 25-27 (arguing that being compelled to provide reactive power capability, without direct compensation, violates cost causation principles).

Vistra contends that the Commission erred in concluding that certain challenges to MISO TOs' proposal were impermissible collateral attacks. Vistra argues that an objection is only a collateral attack if a reasonable party would have perceived a substantial risk that an earlier Commission order meant what the Commission now says it meant.[33] Vistra also asserts that the bar against collateral attacks does not apply to challenges addressing the Commission's statutory or constitutional authority.[34]

12.     Vistra also challenges the Commission's statement that it has previously determined that reactive power service within the standard power factor range requires little or no incremental investment.[35] Vistra asserts that this determination was conclusory and not supported by evidence, that the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) rejected this conclusion in *Dynegy Midwest Generation, Inc. v. FERC*,[36] and that the Commission's prior determinations to this effect are outdated and do not support this claim.[37] Vistra further claims that this conclusion conflicts with other Commission precedent recognizing that "generation resources, particularly inverter-based resources, incur costs to comply with the minimum reactive power requirements set out in their generator interconnection agreements."[38] Clean Energy Advocates also contend that "providing reactive power is both an opportunity cost (because providing additional reactive power may require reducing the amount of real power), and an [operations and maintenance] cost (because providing reactive power imposes wear and tear on a resource)."[39]

---

[33] *See* Vistra Rehearing Request at 11-12 (arguing that prior orders set "general policies" that regional transmission organizations (RTO) could—and MISO did—deviate from; that customers could not have known that this precedent ending separate reactive power compensation could be applicable to MISO; and that such policies did not address the facts here).

[34] *Id.* at 13.

[35] *Id.* at 14.

[36] 633 F.3d 1122, 1126 (D.C. Cir. 2011) (*Dynegy*).

[37] Vistra Rehearing Request at 14-15; *see also* Clean Energy Advocates Rehearing Request at 7-8 (arguing that these prior decisions are outdated given the different generation mix today as compared to 2001 and 2007).

[38] Vistra Rehearing Request at 15-16 (citing *Reactive Power Requirements for Non-Synchronous Generation,* Order No. 827, 155 FERC ¶ 61,277, at PP 35, 38 (2016)).

[39] Clean Energy Advocates Rehearing Request at 6.

13.     Many parties seeking rehearing assert that the Commission failed to adequately consider the effects of eliminating separate reactive power compensation on the MISO markets, particularly with respect to independent power producers' reliance on revenue from such compensation and the disruption attendant to ending such compensation.[40] Certain parties seeking rehearing argue that in light of such alleged reliance, any changes to reactive power compensation should occur only prospectively, and separate compensation for reactive power should not be terminated as to entities that are already receiving it.[41]

14.     Certain parties also challenge the Commission's determination that independent power producers will have the opportunity to recover their costs for Reactive Service through higher power sales rates.  Vistra claims that this conclusion is a departure from precedent recognizing that reactive power is a separate service, with distinct costs from the supply of real power; that the cost of capacity or energy prices would not ordinarily include the "fixed costs" or "sunk costs" associated with reactive power production capability and suggest that including such costs runs the risk of triggering application of MISO's market power mitigation rules; and that existing market prices are already too low to allow merchant generation resources to recover their costs.[42]  Vistra also argues that the D.C. Circuit in *Dynegy* rejected an argument that independent power producers can try to recover their lost revenue through power sales rates.[43]  Clean Energy Generation Owners assert that, as a practical matter, merchant generators will not be successful in reopening existing power purchase agreements to increase their rates.[44]

15.     Vistra, Wolverine, and Clean Energy Advocates contend that the Commission erred in accepting MISO TOs' proposal because MISO TOs failed to demonstrate that eliminating separate reactive power compensation within the standard power factor range would not negatively affect reliability by accelerating the premature retirement or System Support Resource designations of generation resources.[45]  They also claim that

---

[40] *See* Vistra Rehearing Request at 19-20; AQN Wind Rehearing Request at 10; Clean Energy Generation Owners Rehearing Request at 28; Orsted Rehearing Request at 4-8; Wolverine Rehearing Request at 7.

[41] *See* AQN Wind Rehearing Request at 8; Orsted Rehearing Request at 6-7.

[42] Vistra Rehearing Request at 20-21.

[43] *Id.* at 32.

[44] Clean Energy Generation Owners Rehearing Request at 26-27, 36-38, 43.

[45] Vistra Rehearing Request at 17-19; Wolverine Rehearing Request at 2-4, 7-8; Clean Energy Advocates Rehearing Request at 5-6.

the Commission erred in relying on the requirement that new and existing generation will still be required to provide Reactive Service and that MISO can use System Support Resource designations to resolve voltage issues due to retirements in concluding that MISO TOs' proposal would not negatively impact reliability.[46]

16.    AQN Wind and Clean Energy Generation Owners maintain that the Commission's precedent addressing separate compensation for Reactive Service is distinguishable, and therefore does not support accepting MISO TOs' proposal.  AQN Wind claims that *Nevada Power* and *PNM* "concerned transmission owners filing to eliminate the Reactive Service revenues of [their] own generators as well as unaffiliated generators on their respective systems," whereas MISO TOs' proposal applies to all MISO generators, even those with generation connected to the systems of transmission operators who did not support the filing.[47]  Clean Energy Generation Owners argue that, here, MISO itself did not take a position on the proposal to eliminate separate reactive power compensation, unlike other cases in which the transmission provider itself sought to eliminate such compensation.[48]  Clean Energy Generation Owners also assert that CAISO "never provided compensation to generation under Schedule 2 of the CAISO Tariff" and thus circumstances in MISO cannot be compared to those in CAISO.[49]

17.    Citing *Conway*,[50] many parties seeking rehearing argue that MISO TOs' proposal is unduly discriminatory or does not satisfy the comparability standard because MISO

---

[46] Vistra Rehearing Request at 22 (arguing that MISO's analyses reflect that requiring resources to comply with the minimum performance requirements set forth in their GIAs is not going to be sufficient due to growth of inverter-based resources); Wolverine Rehearing Request at 12-13 (arguing that it is inconsistent to conclude that protestors were speculative in concerns about forced retirements and SSR designations, while also relying on the SSR process as a backstop to preserving reliability); Clean Energy Advocates Rehearing Request at 6-7.

[47] AQN Wind Rehearing Request at 7-8; *see also* Clean Energy Generation Owners Rehearing Request at 22-23 (arguing that the Commission has not previously applied the comparability principle to eliminate separate compensation for Reactive Service where fewer than all transmission owners within an RTO or independent system operator (ISO) supported the proposal).

[48] Clean Energy Generation Owners Rehearing Request at 20-21.

[49] *Id.* at 24-27 (arguing that *Cal. Indep. Sys. Operator Corp.*, 160 FERC ¶ 61,035, at PP 7, 19-20 (2017) (*CAISO*) is distinguishable on this basis).

[50] *Conway*, 426 U.S. 271.  In particular, parties seeking rehearing argue that under *Conway* and its progeny, the Commission must consider the interplay between a company's retail and wholesale rates in determining whether a wholesale rate is

TOs might recover the costs of providing reactive power through their retail rates—a possible avenue of recovery unavailable to merchant generation.[51] Relatedly, certain parties assert that the Commission erred in failing to require MISO TOs to "affirm that they will adjust retail rates . . . to remove the adder that covers the Schedule 2 charge for reactive service provided from generation resources."[52] Clean Energy Generation Owners and Wolverine also assert that it is unduly discriminatory and unjust and unreasonable to eliminate Schedule 2 compensation for reactive power production from generating facilities while transmission owners can continue to recover compensation for transmission-installed reactive devices.[53] Further, Clean Generation Energy Owners also claim it is not just and reasonable and is unduly discriminatory, preferential, and anticompetitive, to allow MISO TOs to collect Schedule 2 reactive power compensation for their generation but then eliminate that compensation, such that new independent power producers cannot receive such compensation.[54]

18.     AQN Wind and Clean Energy Generation Owners assert that MISO TOs failed to properly follow the procedures outlined in Appendix K of the MISO TO Agreement. Noting that a filing under Appendix K must be pursuant to a majority vote, they contend that demonstrating that this requirement was met requires MISO TOs to disclose the identities of the entities that voted and which of those entities voted in favor of filing the

---

unduly discriminatory or anticompetitive. *See, e.g.*, Vistra Rehearing Request at 30-32; Clean Energy Advocates Rehearing Request at 8-9.

[51] *See* Vistra Rehearing Request at 30-32 (arguing that the Commission must consider discrimination that comes in the form of a uniform rate yielding disparate overall rates of return); Wolverine Rehearing Request at 9-10, 12 (arguing that *Conway* requires consideration of all sources of revenue in evaluating whether all generators on the MISO system are treated comparably); Clean Energy Advocates Rehearing Request at 8-9; AQN Wind Rehearing Request at 12 (addressing this issue in the context of the waiver of the Commission's 60-day prior notice requirement); Clean Energy Generation Owners Rehearing Request at 36-37, 42-43; Orsted Rehearing Request at 5.

[52] *See, e.g.*, Clean Energy Generation Owners Rehearing Request at 42-43.

[53] Wolverine Rehearing Request at 11; Clean Energy Generation Owners Rehearing Request at 30-32, 38-39, 41-42.

[54] Clean Energy Generation Owners Rehearing Request at 29-30.

proposal.[55] AQN Wind and Clean Energy Generation Owners also argue that MISO TOs did not provide required notice or participate in the stakeholder process concerning the proposal.[56]

19.    Vistra, AQN Wind, Clean Energy Generation Owners, and REC argue that the Commission erred in concluding that MISO TOs could, through a FPA section 205 filing, terminate separate reactive power compensation for independent power producers' generation resources. Vistra, AQN Wind, Clean Energy Generation Owners, and REC contend that under FPA section 205, a public utility has the exclusive right to establish and change the rates, terms, and conditions for the services it provides and that accepting MISO TOs' proposal to eliminate all Schedule 2 compensation undercuts independent power producers' existing cost-based revenue requirements for the provision of reactive power.[57] Vistra disagrees with the Commission's reliance, in reaching this conclusion, on section 9.6.3 of the MISO *pro forma* GIA as providing that "Reactive Service compensation shall be pursuant to a rate schedule filed by the Transmission Provider," asserting that not all generators have agreed to this language in their individual GIAs.[58] REC asserts that, under section 9.6.3 of the MISO *pro forma* GIA, MISO TOs lack the ability to propose to change Schedule 2 compensation because this provision states that compensation will be pursuant to a rate schedule filed by the "Transmission Provider," i.e., a rate schedule filed by MISO itself rather than by MISO TOs pursuant to Appendix K of the MISO TO Agreement.[59]

---

[55] AQN Wind Rehearing Request at 5-6; Clean Energy Generation Owners Rehearing Request at 10-18.

[56] AQN Wind Rehearing Request at 6, 11; Clean Energy Generation Owners Rehearing Request at 23-24.

[57] *See* Vistra Rehearing Request at 27-29; AQN Wind Rehearing Request at 8-9; Clean Energy Generation Owners Rehearing Request at 18-20; REC Rehearing Request at 17-21.

[58] Vistra Rehearing Request at 23-26 (citing alleged examples of such GIAs among others and asserting that Order No. 2003-B states that the Commission was not disturbing present arrangements for reactive power compensation).

[59] REC Rehearing Request at 9-16; *cf.* Vistra Rehearing Request at 28 (arguing that *Dynegy* does not support the conclusion that MISO TOs have the ability to file to adjust Schedule 2 compensation because that case found a different proposal to adjust reactive power compensation was unduly discriminatory and any discussion of MISO TOs' filing authority was dicta).

20.     Vistra argues that the Commission erred in concluding that MISO TOs' proposal does not violate the Takings Clause or Due Process Clause of the Fifth Amendment.[60] More particularly, Vistra contends that "[f]orcing generators to supply an identifiable portion of the reactive power they generate, without any compensation, as a condition of interconnection to the grid, falls squarely within the kinds of takings prohibited by the Takings Clause."[61]  Vistra asserts that generators have a property interest in the reactive power they create that is distinct from the real power they generate.[62]

21.     Finally, various parties raise a number of miscellaneous objections to the Reactive Power Order.  Clean Energy Generation Owners assert that MISO TOs' proposal is "predicated on a claim of eliminating compensation because the reactive support from generating resources is not needed" and that the Commission "failed to require MISO [TOs] to provide evidence to support the claim that there is no need for reactive supply in the deadband in certain MISO locales."[63]  Clean Energy Generation Owners also claim that termination of separate reactive power compensation under Schedule 2 will "skew the stakeholder discussions" regarding how to address reliability challenges in the MISO region.[64]  AQN Wind and Wolverine argue that the Commission should have refrained from acting on MISO TOs' proposal, or set it for a hearing, in light of the pending proceedings in Docket No. RM22-2-000 addressing the potential reform of compensation for reactive power capability.[65]  AQN Wind and Clean Energy Generation Owners also contend that the Commission erred in waiving the Commission's 60-day prior notice requirement for MISO TOs' proposal.[66]

---

[60] Vistra Rehearing Request at 33-35.

[61] *Id.* at 34 (contending that the "coerced nature of the 'obligation' to provide reactive power" confirms the alleged Due Process violations).

[62] *Id.* at 34-35.

[63] Clean Energy Generation Owners Rehearing Request at 32-36.

[64] *Id.* at 41.

[65] Wolverine Rehearing Request at 8; AQN Wind Rehearing Request at 10-11.

[66] AQN Wind Rehearing Request at 12; Clean Energy Generation Owners Rehearing Request at 43-45 (arguing that the Commission has previously denied independent power producers' requests to waive the Commission's 60-day prior notice requirement to allow for collection of reactive compensation to begin under MISO Schedule 2 at the earliest possible date).

## III.   Discussion

### A.   Procedural Matters

22.   On March 13, 2023, Alliant Energy Corporate Services, Inc. (AECS) filed a
motion for leave to answer and answer to the rehearing requests.  On April 14, 2023,
MISO TOs also filed a motion for leave to answer and answer to the rehearing requests.
Rule 713(d) of the Commission's Rules of Practice and Procedure prohibits an answer to
a request for rehearing.[67]  Accordingly, we deny AECS's and MISO TOs' motions to
answer and reject the answers.

### B.   Substantive Matters

#### 1.   Comparability Standard

23.   As the Commission has previously explained, electric power consists of two
components:  real power, which is "the power that does real work—and thus the power
that sellers are looking to sell and that buyers are looking to buy;" and reactive power,
which is necessary to maintain adequate voltages so that real power can be transmitted.[68]
The provision of reactive power by generating facilities involves two different concepts.
Where reactive power is provided outside of the standard power factor range, it is "an
ancillary service for *transmitting power across the grid* to serve load."[69]  By contrast,
where the generating facility is operating within the standard power factor range, "it is
meeting its obligation as a generator to maintain the appropriate power factor in order to
maintain voltage levels for energy *entering the grid* during normal operations."[70]  Put
differently, reactive support by generating facilities operating within the standard power
factor range ensures that when these facilities inject real power—the product that their

---

[67] 18 C.F.R. § 385.713(d)(1) (2022).

[68] *Sw. Power Pool, Inc.*, 119 FERC ¶ 61,199 at P 28 (*SPP*), *order on reh'g*,
121 FERC ¶ 61,196, at PP 16-22 (2007) (SPP Order on Rehearing); *see also Bonneville*,
120 FERC ¶ 61,211 at P 21 ("The purpose for which generation assets are built
(including reactive power capability to maintain voltage levels for generation entering
the grid) is to make sales of real power.").

[69] *Mich. Elec. Transmission Co.*, 97 FERC ¶ 61,187, at 61,852-53 (2001)
(emphasis added).

[70] *Id.* at 61,853 (emphasis added); *SPP*, 119 FERC ¶ 61,199 at P 29; *cf. Dynegy
Midwest Generation, Inc.*, 125 FERC ¶ 61,280, at P 16 (2008) ("Reactive power is a
localized service that is quickly used by transmission system components and cannot be
transported over long distances.").

facilities exist to create and sell—onto the grid under normal conditions, they can do their part to maintain adequate voltages and to not threaten reliability.

24.     Order No. 2003 reflects the distinction between these two different reactive power concepts.[71]  When the transmission provider asks the interconnecting generator to operate its facility outside the established power factor range, the transmission provider is required to pay the interconnecting generator for the provision of such reactive power.[72]  By contrast, compensation for reactive power when the generating facility is operating within the established power factor range is generally not required.[73]  The sole exception the Commission identified was that "if the Transmission Provider pays its own or its affiliated generators for reactive power within the established range, it must also pay the Interconnection Customer."[74]  This is generally referred to as the comparability standard.[75]

25.     In the Reactive Power Order, the Commission accepted MISO TOs' proposal to eliminate all charges under Schedule 2 for the provision of Reactive Service.  The effect of this order was not to "categorically prohibit new generation resources from seeking to recover the costs of their investment in reactive power capability."[76]  Rather, this order eliminated only Schedule 2's mandated, separate stream of compensation for the capability of providing Reactive Service, which had been required in MISO consistent with the comparability standard.  This result is not unusual, and is in fact already the case

_____

[71] Reactive Power Order, 182 FERC ¶ 61,033 at P 3; *see also* Standard Large Generator Interconnection Procedures, app. 6 (Standard Large Interconnection Agreement), art. 9.6.3 (providing that payment for reactive power is required outside the standard power factor range is required, but payment within the standard power factor range is required only "if the Transmission Provider pays its own or affiliated generators within the specified range"); Standard Small Generator Interconnection Agreement, art. 1.8.2 (similar).

[72] Reactive Power Order, 182 FERC ¶ 61,033 at P 3.

[73] *Id.* (citing Order No. 2003, 104 FERC ¶ 61,103 at P 546).

[74] Order No. 2003-A, 106 FERC ¶ 61,220 at P 416.

[75] Reactive Power Order, 182 FERC ¶ 61,033 at P 3.

[76] *See, e.g.*, Vistra Rehearing Request at 4.  This is setting aside, for the time being, that the record does not reflect that generating facilities have incurred incremental investment costs for reactive power capability within the standard power factor range, beyond the investment in equipment necessary to produce real power, in the first place. *See infra* PP 30-31.

in other large RTOs or ISOs:  for example, Southwest Power Pool, Inc. has eliminated,[77] and CAISO never provided,[78] such stand-alone compensation for Reactive Service.

###    a.    Cost Recovery

26.    In accepting MISO TOs' proposal, the Commission reiterated its longstanding policy "that the provision of reactive power within the standard power factor range is, in the first instance, an obligation of the interconnecting generator and good utility practice," such that "MISO TOs do not have an obligation to continue to compensate an independent generator for reactive power within the standard power factor range when its own or affiliated generators are no longer being compensated."[79]  On rehearing, we continue to reject, as collateral attacks on that longstanding policy, arguments that stand-alone compensation for Reactive Service is generically required—for example, to ensure that generators can recover their costs for Reactive Service capability.[80]  These arguments would negate the conclusions in Order Nos. 2003 and 2003-A that such compensation should not be provided, except as required by the comparability standard.[81]

27.    We also are not persuaded by Vistra's claims that interconnection customers in MISO could not have known that the Commission would apply the principles in Order Nos. 2003 and 2003-A to the MISO region.[82]  The statements regarding compensation for Reactive Service in Order Nos. 2003 and 2003-A are unambiguous, with the

---

[77] *See SPP*, 119 FERC ¶ 61,199 at P 30.

[78] *CAISO*, 160 FERC ¶ 61,035 at PP 7, 19-20.

[79] Reactive Power Order, 182 FERC ¶ 61,033 at P 53 (finding "those protests that challenge these well-established policies to be collateral attacks on these earlier determinations").

[80] *See, e.g.*, Vistra Rehearing Request at 7-8; *id.* at 9-11; REC Rehearing Request at 25-27.

[81] *See Transwestern Pipeline Co. v. FERC*, 988 F.2d 169, 174 (D.C. Cir. 1993) ("Of course, if Transwestern's argument were accepted, Order No. 490 would be a dead letter . . . .  It should be obvious, therefore, that petitioner has brought an impermissible collateral attack on the regulation."); *see also* SPP Order on Rehearing, 121 FERC ¶ 61,196 at P 21 ("Such argument implies that, even absent a claim that such compensation is required by comparability, the Commission is *obligated* to provide cost recovery through Schedule 2.  As we have said herein, that is not the case."); *Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 824-25 (D.C. Cir. 2008).

[82] *See* Vistra Rehearing Request at 11-12.

comparability standard as the singular exception.[83]  The Commission has consistently followed these principles in a string of cases[84] allowing transmission providers to eliminate Schedule 2 reactive power compensation within the standard power factor range.[85]

28.    We disagree with Vistra's claim that Order No. 2003-B casts doubt on the principles articulated in Order Nos. 2003 and 2003-A regarding the circumstances under which reactive power compensation is required.[86]  Instead, the Commission explained in Order No. 2003-B that Order No. 2003-A did not "prejudge *how* the Interconnection Customer is to be compensated for providing reactive power," should compensation be provided.[87]  Moreover, even if there were some ambiguity in the Commission's statement

---

[83] Reactive Power Order, 182 FERC ¶ 61,033 at P 53 ("Order Nos. 2003 and 2003-A do not mandate that once a transmission provider compensates its own or affiliated generators it may never discontinue such compensation and must, as a result, always compensate unaffiliated generators.").

[84] *See Nevada Power*, 179 FERC ¶ 61,103 at PP 20-21 (explaining that "[t]he Commission has stated that the decision to compensate affiliates and non-affiliates for reactive service capability rests with the transmission provider" and the transmission provider may eliminate such compensation; rejecting reliance arguments); *PNM*, 178 FERC ¶ 61,088 at P 29; *Bonneville*, 120 FERC ¶ 61,211 at P 20 ("Commission policy clearly allows [Bonneville Power Administration] to discontinue paying all its merchants for inside the deadband reactive power service."); Bonneville Order on Rehearing, 125 FERC ¶ 61,273 at  P 11; *SPP*, 119 FERC ¶ 61,199 at PP 30-32 (accepting proposal to terminate reactive power compensation based on application of comparability); *E.ON*, 119 FERC ¶ 61,340 at PP 12-15; *Entergy Servs., Inc.*, 113 FERC ¶ 61,040 at PP 22-24, 38-39; *cf. CAISO*, 160 FERC ¶ 61,035 at P 19 ("In CAISO, there is no compensation for any generators for providing reactive power capability inside the standard power factor range.").

[85] Vistra's reliance on *Cent. Hudson Gas & Elec. Corp. v. FERC*, 783 F.3d 92, 104-05 (2d Cir. 2015), is not persuasive.  That case involved a dispute as to the specific application of general principles established by a previous Commission order. Vistra's arguments here that Schedule 2 compensation *must* be offered to ensure that generating facilities can recover their costs are direct attacks on the principles articulated in Order Nos. 2003 and 2003-A.

[86] *See* Vistra Rehearing Request at 12.

[87] Order No. 2003-B, 109 FERC ¶ 61,287 at P 120 (emphasis added); *see also id.* P 115.

of these principles, this ambiguity would not allow Vistra (or others) to evade the bar against collateral attacks.[88]

29.     In addition, such arguments relying on the need to recover alleged costs of providing Reactive Service are unpersuasive on their substance, even assuming they could be properly brought now.  As the Commission noted in the Reactive Power Order, it has "found that reactive power service within the standard power factor range requires little or no incremental investment."[89]  On rehearing, Clean Energy Advocates and Vistra challenge the conclusion that Reactive Service requires little or no incremental investment,[90] but neither identifies record evidence demonstrating that there are more than minimal capital expenditures on equipment or additional operations and maintenance costs attributable to providing Reactive Service.  Instead, Clean Energy Advocates allude to alleged opportunity costs and operation and maintenance costs,[91] but point to no evidence of such costs,[92] and the basis for Vistra's challenges on this issue is whether the Commission's conclusion is sufficiently supported by the precedent it cited.[93]  We continue to conclude, and the record establishes, that Reactive Service requires little or no incremental investment, and further explain that conclusion here.

---

[88] *Dominion Res., Inc. v. FERC*, 286 F.3d 586, 589-90 (D.C. Cir. 2002) (holding that "[m]ere ambiguity" does not excuse a failure to challenge an order at the time it issued); *ANR Pipeline Co. v. FERC*, 988 F.2d 1229, 1234 (D.C. Cir. 1993).

[89] Reactive Power Order, 182 FERC ¶ 61,033 at P 55 & n.196.

[90] *See* Vistra Rehearing Request at 14-16; Clean Energy Advocates Rehearing Request at 6-8.

[91] Clean Energy Advocates Rehearing Request at 6.

[92] In addition to failing to provide evidence of such costs, Clean Energy Advocates fail to acknowledge Commission precedent reflecting that "operating a generating unit within the proposed deadband does not affect the generation output of a unit."  *Ariz. Pub. Serv. Co.*, 94 FERC ¶ 61,027, at 61,079-80 (2001).  Nor do they provide evidence of increased operation and maintenance costs, and they fail to recognize that generating both real and reactive power generally involves operating and maintaining the same equipment.

[93] Vistra Rehearing Request at 14-16.

30.    For synchronous resources, there is little or no incremental capital expenditure associated with the equipment necessary for the production of reactive power because the same equipment is used for the production of real power.[94]  Our conclusion that the same equipment used for Reactive Service is also necessary to produce real power is also supported by application of the cost allocation methodology commonly referred to as the AEP methodology.[95]  The AEP methodology was developed by the American Electric Power Service Corp., and ultimately accepted by the Commission, to apportion costs for its synchronous generating plants.  Today, it is commonly used by resources to develop cost-based Reactive Service rates in regions that allow cost-based compensation for such Reactive Service under the comparability standard.[96]  As to non-synchronous resources,[97] the principal piece of equipment required for non-synchronous resources to produce reactive power is the inverter,[98] which is already necessary to convert the direct current produced by non-synchronous resources to alternating current—i.e., to supply real power that can be injected into alternating current power systems.  On rehearing and in earlier protests, no party points to any other equipment costs incurred by non-synchronous generating facilities that are attributable to providing Reactive Service.[99]  Notably, while

---

[94] *See S. Co. Servs., Inc.*, 80 FERC ¶ 61,318, at 62,091 (1997) (noting also that the primary function of a generating plants is to produce real power; thus, if costs were allocated based on the "predominant" function of the equipment, "all of the costs of generation would thus be assigned to real power production and there would be no basis for any separate reactive power charge").

[95] *See Am. Elec. Power Serv. Corp.*, Initial Decision, 80 FERC ¶ 63,006 (1997) (AEP Initial Decision), *aff'd in part, rev'd in part*, Opinion No. 440, 88 FERC ¶ 61,141 (1999) (*AEP*).

[96] *See Dynegy Midwest Generation, Inc.*, 121 FERC ¶ 61,025, at P 3 (2007).

[97] *See* Vistra Rehearing Request at 15-16 & n.64 (citing Order No. 827 and arguing that "[t]he Commission's reasoning also conflicts with prior Commission precedent recognizing that generation resources, particularly inverter-based resources, incur costs to comply with the minimum reactive power requirements"); Clean Energy Advocates Rehearing Request at 7-8.

[98] *See, e.g.*, Order No. 827, 155 FERC ¶ 61,277 at P 23 (explaining that the reason older wind generators could not produce and control reactive power without the use of costly equipment was "because they did not use inverters like other non-synchronous generators" but modern turbines now use inverters and newer wind generators now can, therefore, produce and control reactive power); *see also id.* P 4.

[99] Vistra cites a 2014 staff report generically stating that there "is a cost to solar plants providing reactive power."  Vistra Rehearing Request at 16 n.64 (quoting *Third-*

the Commission previously exempted wind generators from the obligation to provide reactive service due to technological constraints that would have necessitated substantial additional equipment costs to produce reactive power, it did not similarly so exempt other non-synchronous resources.[100]

31.    Vistra challenges the conclusion that Reactive Service requires little or no incremental investment by claiming that the D.C. Circuit in *Dynegy* rejected that conclusion.[101]  We disagree with Vistra's interpretation of *Dynegy*.  Rather, in *Dynegy*, the court concluded that the Commission had not made any such finding in that case, instead providing only a "glancing remark" to this effect, and that the record in that case did not support such a finding.[102]  Here, in addition to noting the Commission's previous conclusions that Reactive Service capability requires little or no incremental investment, we have further explained immediately above the basis for this finding.

### b.    Reliance

32.    Numerous parties assert that independent power producers have come to rely on Schedule 2 compensation and argue that the Commission therefore erred in accepting MISO TOs' proposal.[103]  At the outset, we once again note that the Commission's acceptance of MISO TOs' proposal in light of the comparability standard was an application of the Commission's long-standing policy in Order Nos. 2003 and 2003-A,

---

*Party Provision of Reactive Supply and Voltage Control and Regulation and Frequency*, Commission Staff Report: Payment for Reactive Power, Docket No. AD14-7-000, at 18 (Apr. 22, 2014)); *id.* (citing Order No. 827, 155 FERC ¶ 61,277 at PP 35, 38) (describing equipment that can be used by non-synchronous resources to provide reactive service or compensate for losses of such power)).  However, Vistra does not discuss the magnitude of any such costs independent from the cost of providing real power.

[100]  *See* Order No. 827, 155 FERC ¶ 61,277 at PP 4, 7-8, 23.

[101]  *See* Vistra Rehearing Request at 14.

[102]  *Dynegy*, 633 F.3d at 1127-28.  One should not conflate the loss of revenue under Schedule 2 with whether a generator has incurred costs related to providing reactive service.  Schedule 2 compensation is derived from a legal construct—an allocation factor—that apportions the costs of the same equipment among real versus reactive power production.

[103]  *See* Vistra Rehearing Request at 19-20; AQN Wind Rehearing Request at 10; Clean Energy Generation Owners Rehearing Request at 28; Orsted Rehearing Request at 4-8; Wolverine Rehearing Request at 7.

consistent with its numerous subsequent decisions.[104]  The parties on rehearing are, in effect, urging that generators' unilateral business decisions to treat Schedule 2 compensation as irrevocable should amount to a new exception—in addition to the comparability standard—to Order No. 2003's determination that compensation for Reactive Service should not be provided.  The Commission rejected that argument in the Reactive Power Order,[105] and we sustain that determination on rehearing.

33.    Moreover, even considering this reliance argument on its substance, we find that generators' assumption that such compensation will continue to be available does not give rise to reliance interests that justify requiring that such compensation continue to be provided.[106]  Again, compensation for Reactive Service under Schedule 2 has always been contingent on satisfaction of the comparability standard, and our prior decisions have repeatedly accepted proposals to eliminate such compensation.[107]  Sophisticated parties, like independent power producers, have the ability to manage risks of this sort in entering long-term arrangements rather than assuming that this compensation will be available in perpetuity.[108]

34.    In addition, the record does not substantiate that independent power producers do, in fact, have significant reliance interests that are threatened by the elimination of Schedule 2 compensation for Reactive Service.[109]  As discussed above, it does not appear

---

[104] *See supra* P 27 n.84.

[105] *See* Reactive Power Order, 182 FERC ¶ 61,033 at PP 53-54.

[106] *See, e.g.*, *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 577-78 (D.C. Cir. 2019) (explaining that it was "far from obvious" that alleged reliance interest on statutorily prescribed volumes of renewable fuel "merit special consideration" where such volumes were subject to adjustment); *Mozilla Corp. v. FCC*, 940 F.3d 1, 63-65 (D.C. Cir. 2019) (rejecting reliance argument because "such reliance would have been unreasonable on the facts before us"); *Bell Atl. Tel. Cos. v. FCC*, 79 F.3d 1195, 1205 (D.C. Cir. 1996).

[107] In this vein, we reiterate that we are not persuaded by efforts to claim that these cases are inapplicable.  *See* Reactive Power Order, 182 FERC ¶ 61,033 at PP 56-57; AQN Wind Rehearing Request at 7-8; Clean Energy Generation Owners Rehearing Request at 20-21.

[108] *See Exxon Mobil Corp. v. FERC*, 430 F.3d 1166, 1177 n.7 (D.C. Cir. 2005).

[109] *See Solenex LLC v. Bernhardt*, 962 F.3d 520, 529-30 (D.C. Cir. 2020) ("[U]nidentified and unproven reliance interests are not a valid basis on which to undo agency action.").

that independent power producers have incurred more than minimal costs to produce Reactive Service in reliance on the availability of such compensation. And while we have been presented with broad claims that independent power producers have taken into account the availability of such compensation when making economic decisions,[110] the record does not show that this is the case. In this vein, simply pointing to the aggregate amount of reactive power compensation under Schedule 2 does not support the claim that independent power producers have engaged in economic decisions in reasonable reliance on that compensation.[111] As to power purchase agreements, in particular, we note that such agreements are typically entered into as an aspect of securing financing for a project, long before compensation will be sought for Reactive Service or the amount of such compensation that may be received is known.[112]

### c. Reliability

35.     We disagree that the Commission failed to adequately consider the effects of eliminating Schedule 2 compensation on grid reliability.[113] The Reactive Power Order considered the potential reliability impacts of MISO TOs' proposal,[114] and we sustain its conclusions for the reasons articulated therein. Moreover, arguments that accepting

---

[110] *See, e.g.*, Vistra Rehearing Request at 19-20; AQN Wind Rehearing Request at 10; Clean Energy Generation Owners Rehearing Request at 28; Orsted Rehearing Request at 4-8; Wolverine Rehearing Request at 7.

[111] We note that the aggregate amount of reactive power compensation pointed to by some parties is spread across hundreds of generators, many of which are owned by MISO TOs. *See* Clean Energy Generation Owners January 20 Answer at 15. Thus, looking to this aggregate amount inflates the apparent effect on independent power producers of eliminating Schedule 2 compensation.

[112] Commission-accepted annual reactive power revenue requirements are often substantially less than the amount initially sought by generators. For example, the annual revenue requirement approved in *Panda Stonewall, LLC* is just 33% of the amount initially sought. *See Panda Stonewall*, *LLC*, 176 FERC ¶ 61,072, at PP 1, 6 (2021); *see also* Panda Stonewall, LLC, Transmittal, Clean Tariff, Docket No. ER17-1821-000 (filed June 14, 2017).

[113] *See* Vistra Rehearing Request at 17-19 (claiming that eliminating such compensation may lead to retirements and supply shortfalls); Wolverine Rehearing Request at 2-3, 7-8 (similar); Clean Energy Advocates Rehearing Request at 5-6.

[114] Reactive Power Order, 182 FERC ¶ 61,033 at P 55.

MISO TOs' proposal erodes the incentive to invest in reactive power capability[115] are unpersuasive. Under Order Nos. 2003 and 2003-A, reactive power capability within the standard power factor range (i.e., Reactive Service) is and remains mandatory for generator interconnection, without incentives. The financial and other incentives[116] for generators to invest in equipment to ensure reliability by providing reactive power outside of the standard power factor range are unaltered by and, in fact, not at issue in MISO TOs' proposal.

36.   Wolverine claims that the Commission's reasoning in accepting MISO TOs' proposal was internally inconsistent.[117] Specifically, it asserts that it was inconsistent for the Commission to reject as speculative concerns that MISO TOs' proposal will accelerate potential resource retirements while also finding that reliability issues that such potential retirements might pose can be addressed through System Support Resource designations.[118] We disagree. There is no inconsistency between the Commission's finding that claims regarding potential resource retirements were speculative but also concluding that *even if* such retirements were to occur, System Support Resource designations could mitigate the concerns such retirements might pose.

## 2.   Retail Rates

37.   Certain parties argue, primarily relying on *Conway*, that the possibility that generation owned or controlled by MISO TOs might recover the costs of reactive power capability from retail ratepayers requires that independent power producers must also be compensated for such costs in their wholesale rates.[119] But this amounts to a generic

---

[115] *See, e.g.*, Wolverine Rehearing Request at 3; Vistra Rehearing Request at 22; Clean Energy Advocates Rehearing Request at 6.

[116] For instance, generators have incentives to install equipment to ensure that their generation remains online and delivering real power.

[117] Wolverine Rehearing Request at 12-13.

[118] The staff reports cited by Wolverine do not necessarily reflect the views or findings of the Commission. *See* Wolverine Rehearing Request at 4-6. In addition, that these staff reports discuss different potential approaches to reactive power compensation does not render them valid bases for re-examination of or collateral attack on the principles adopted Order Nos. 2003 and 2003-A.

[119] *See* Wolverine Rehearing Request at 9-12; Clean Energy Advocates Rehearing Request at 8-9; Clean Energy Generation Owners Rehearing Request at 42-43; Orsted Rehearing Request at 5; Vistra Rehearing Request at 30-32; *cf.* AQN Wind Rehearing

argument that Schedule 2 compensation for Reactive Service is required not just when the transmission owner "pays its own or its affiliated generators for reactive power within the established range"[120] but also when the transmission owner has the opportunity to recover its costs through its bundled retail rates. Neither Order Nos. 2003 and 2003-A, nor any of the Commission's prior decisions, have ever suggested this requirement.

38.     In fact, the opportunity transmission owners have to recover such costs through retail rates was raised before the Commission in Order No. 2003-B. There the Commission considered an argument asserting that a transmission owner "is generally paid for providing this service to retail customers through a bundled rate. The cost of providing this service to wholesale customers is recovered through transmission rates."[121] In addressing this argument, the Commission confirmed that the "trigger" to compensate interconnection customers for providing Reactive Service was "when the Transmission Provider includes reactive power related costs in its transmission revenue requirement," without suggesting that the opportunity to recover such costs through retail rates also triggered such a payment obligation.[122] Arguments that Schedule 2 compensation is required unless transmission owners disclaim the opportunity to recover Reactive Service costs in their retail rates were required to have been brought as challenges to Order No. 2003 and are not now properly before us.[123]

39.     Regardless, we sustain the Commission's rejection of these arguments for the reasons articulated in the Reactive Power Order, which concluded that the possibility of compensation through retail rates did not give rise to a comparability issue or dictate that the Commission require compensation under Schedule 2.[124] We further note that *Conway*

---

Request at 12 (addressing this issue in the context of the waiver of the Commission's 60-day prior notice requirement).

[120] Order No. 2003-A, 106 FERC ¶ 61,220 at P 416.

[121] Order No. 2003-B, 109 FERC ¶ 61,287 at P 114.

[122] *Id.* P 119; *see also* Order No. 2003-C, 111 FERC ¶ 61,401 at PP 34, 36, 42 (addressing arguments that the "revenue requirements associated with [reactive power from generation sources] are not recovered in a transmission revenue requirement," but still not suggesting that the opportunity to recover such costs through retail rates would trigger the obligation to compensation independent power producers).

[123] *See supra* PP 26, 27 note 88 (explaining that such arguments are impermissible collateral attacks).

[124] *See* Reactive Power Order, 182 FERC ¶ 61,033 at PP 58-60. We also reject the argument that Schedule 2 compensation cannot be eliminated because it has been historically afforded and newer market participants would prefer to receive it. *See* Clean

concerned allegations of actual anticompetitive behavior, namely that a public utility engaged in the sale of energy at both retail and wholesale sought to raise its wholesale rates in a way that would squeeze its customers, who competed with it in the retail market, out of that retail market.[125]  The U.S. Supreme Court held that the Commission has jurisdiction to consider the interplay between retail and wholesale rates in assessing a proposal to change a wholesale rate.[126]  Here, by contrast, there are no allegations of anticompetitive behavior parallel to those in *Conway*, and—as noted in the Reactive Power Order—we conclude that the comparability principle is satisfied by the fact that Schedule 2 compensation is being terminated for all generation, notwithstanding that the particular alternative avenues available to seek to recover Reactive Service costs may differ between transmission owners and independent power producers.[127]

40.      Certain parties also attempt to rebut the Commission's conclusion that independent power producers have opportunities, independent of Schedule 2, to attempt to recover any costs related to providing Reactive Service.[128]  Vistra claims that the D.C. Circuit in *Dynegy* rejected the Commission's claim that independent power producers could recover such costs in their market-based rates.[129]  Not so:  the D.C. Circuit cast no doubt on the ability of independent power producers to recover such costs through market-based rates.  Instead, it found that the opportunity to do so did not adequately respond to the concerns at issue given the particular competitive dynamics presented because generators that attempted to do so "would suffer an increased risk of being undersold by generators from zones where reactive power costs are compensated."[130]  In addition, that some independent power producers may have entered into power purchase agreements based on their assumption that Schedule 2 compensation could not be

---

Energy Generation Owners Rehearing Request at 29.  MISO TOs' proposal to eliminate Schedule 2 compensation treats all generators comparably, and newer market participants broadly asserting a preference to receive Schedule 2 compensation does not demonstrate that eliminating such compensation will have an anticompetitive effect.

[125] *Conway*, 426 U.S. at 272-73.

[126] *Id.*

[127] *See* Reactive Power Order, 182 FERC ¶ 61,033 at P 60.

[128] *Cf. supra* PP 29-31 (explaining the conclusion that providing such service requires little or no incremental investment).

[129] Vistra Rehearing Request at 32.

[130] *See Dynegy*, 633 F.3d at 1127.

terminated[131] and argue that they may now encounter practical barriers to renegotiating those agreements[132] does not negate that independent power producers are being treated comparably to generation owned by or affiliated with MISO TOs with regard to Schedule 2 compensation for Reactive Service.[133]

41.    Vistra asserts that the Commission's conclusion that generation resources have other opportunities, beyond Schedule 2, through which they can attempt to recover their costs of reactive power (if, indeed, they have any such costs in the first place, which they have not demonstrated[134]) is inconsistent with "precedent recognizing that reactive power is a separate service."[135]  We disagree.  As explained above, the Commission has treated reactive service outside the standard power factor range as a separate ancillary service for which stand-alone compensation is required, but reactive service within the standard power factor range is an obligation of interconnection as to which compensation is not required unless necessary under the comparability standard.[136]

42.    Nor do we credit Vistra's arguments that, in MISO, generators will be unable to recover any costs attributable to providing Reactive Service capability—which, again, the record does not demonstrate they have incurred—through mechanisms other than Schedule 2.  While the Commission precedent Vistra relies upon appropriately recognizes distinctions between reactive power, real power, and capacity, Vistra does not establish that the MISO Tariff precludes the inclusion of investments or "sunk costs" attributable to Reactive Service in capacity offers and energy offers.  On rehearing, we conclude that Vistra has still not adequately explained why generators cannot include the costs

---

[131] *But see supra* PP 33-34 (noting that we have not been presented evidence demonstrating that this is the case and, in any event, such assumptions were not warranted).

[132] *See* Clean Energy Generation Owners Rehearing Request at 26-27, 36-38, 43.

[133] *See* Reactive Power Order, 182 FERC ¶ 61,033 at P 60 ("[N]either will recover compensation for the capability to provide reactive power within the standard power factor range under MISO's Schedule 2 and both may pursue recovery of any lost revenue in other ways."); SPP Order on Rehearing, 121 FERC ¶ 61,196 at PP 20, 22.

[134] *See supra* PP 30-31 (concluding that providing reactive power in the standard power factor range requires little or no incremental investment).

[135] Vistra Rehearing Request at 20-21.

[136] *See supra* PP 23-24.

attributable to Reactive Service in energy offers or capacity offers,[137] even if subject to market power mitigation, and its argument is not supported by MISO's Tariff.  As to capacity offers, among the "going forward" costs that can be recovered are "mandatory capital expenditures necessary to comply with federal . . . reliability requirements," which would appear to include any (hypothetical) capital investments and expenditures associated with Reactive Service capability.[138]  As to energy offers, Vistra does not explain the basis for its assertion that the Tariff bars including any incremental costs associated with Reactive Service capability (e.g., fuel costs, short-term variable operations and maintenance) in such offers.[139]  Moreover, while Vistra claims that "a generation resource that attempts to recover its fixed costs of reactive power through its energy or capacity offers runs the risk that it will trigger application of MISO's market power mitigation rules,"[140] even assuming this is correct, this would not preclude generators from recovering such costs in the capacity market, but rather would require that they verify the costs with the independent market monitor.[141]  The cases Vistra cites

---

[137] *See* Reactive Power Order, 182 FERC ¶ 61,033 at P 58 & n.207 ("Vistra does not explain what these costs are or provide support as to why Vistra would not include these costs in energy offers and could not include them in capacity offers.").

[138] MISO, FERC Electric Tariff, Module D, § 64.1.4 (69.0.0), § 64.1.4(e)(iii)(a)(8).

[139] *See id.*, § 64.1.4(a)(ii) (setting forth a method of calculating energy offer reference levels based on "information submitted by or in consultation with the Market Participant submitting the Offer or Offers at issue and intended to reflect a unit's marginal costs, as supported by data submitted to the Operating Cost Survey" and providing a non-exhaustive list of cost data, including opportunity cost data, that may be submitted through an Operating Cost Survey); *id.*, § 64.1.4(e)(iii)(c)(4) ("Market Participants may not include [in going-forward costs those] costs that are normally included for recovery in energy and ancillary services offers (fuel and short-term variable O&M).").

[140] Vistra Rehearing Request at 21.

[141] *See* MISO, FERC Electric Tariff, Module D, § 64.1.4(e)(iii)(c)(6)-(7) (providing that, for the submission of going-forward costs, "Market Participants must provide sufficient detail to validate the costs and to differentiate between fixed and variable costs . . . [and] Market Participants must [also] provide descriptions of the cost items and why they are needed to support the cases"); *see also id.*, § 64.1.4(e)(iii)(c)(3) (providing that "the Market Participant has the option of using [] default technology specific avoidable costs in place of the non-capital portion of the avoidable costs . . . .").

also do not establish that where Schedule 2 compensation for Reactive Service is not available, seeking compensation through other mechanisms is impermissible.[142]

43.    We also continue to reject arguments that it is unduly discriminatory or preferential that MISO TOs will continue to be compensated for their transmission-installed reactive devices.[143]   These arguments mischaracterize the rationale behind the comparability standard by treating that standard as directed toward ensuring that compensation for all reactive power *assets*—regardless of whether they are generation or transmission assets—is provided on the same terms.  As the Commission explained in the Reactive Power Order, "comparability requires that transmission owners treat unaffiliated generators comparably to their own and affiliated generators under Schedule 2, which we have found MISO TOs have done."[144]   It does not extend to the treatment of transmission assets that provide reactive power on the transmission grid.

### 3.    Filing Rights and Procedures

44.    On rehearing, AQN Wind and Clean Energy Generation Owners reiterate their arguments that MISO TOs' proposal failed to follow the appropriate procedures under Appendix K of the MISO TO Agreement.  Specifically, AQN Wind and Clean Energy Generation Owners argue that the filing was not supported by the required majority vote nor was it the result of the required stakeholder process.[145]   These arguments are unpersuasive for the reasons stated in the Reactive Power Order.[146]   There is no requirement that the filing be supported by a public vote of eligible MISO TOs, under

---

[142] *See Panda Stonewall LLC*, Opinion No. 574, 174 FERC ¶ 61,266, at P 155 (2021) (explaining that "only a small percentage of a generator's fuel costs is related to the provision of reactive power"); *Me. Pub. Utils. Comm'n*, 126 FERC ¶ 61,090, at P 41 (2009) (explaining that under ISO New England Inc.'s construct, certain capacity payments did not result in double recovery for capital costs when considered in light of compensation for reactive service under Schedule 2); *ISO New England Inc.*, 126 FERC ¶ 61,212, at 62,197 (2009) (similar).

[143] *See* Clean Energy Generation Owners Rehearing Request at 30-32, 38-39, 41-42; Wolverine Rehearing Request at 11.

[144] Reactive Power Order, 182 FERC ¶ 61,033 at P 61.

[145] AQN Wind Rehearing Request at 5-6, 11; Clean Energy Generation Owners Rehearing Request at 10-18, 23-24.

[146] *See* Reactive Power Order, 182 FERC ¶ 61,033 at PP 64, 67.

which the identity of those voting and how they voted must be disclosed, and we have no reason to doubt MISO TOs' statement as to the outcome of the vote.[147]

45.    In the Reactive Power Order, the Commission also rejected arguments that MISO TOs lacked authority to file their proposal under FPA section 205 because MISO TOs only have unilateral filing rights as to their own generators.[148]  The Commission explained it had previously found, and the D.C. Circuit in *Dynegy* affirmed, that

> pursuant to the settlement adopting section 9.6.3 of the MISO *pro forma* GIA, "transmission owners and the Midwest ISO share the same section 205 filing right, which is the right to submit filings under FPA section 205 to govern the rates, terms, and conditions applicable to the provision of ancillary services."[149]

On rehearing, Vistra challenges the Commission's statement that *Dynegy* affirmed that transmission owners and MISO share the same FPA section 205 filing right as dicta.[150]  However, Vistra does not attempt to substantively rebut the reasoning underlying the Commission's conclusion.[151]  We disagree that *Dynegy* addressed this issue with only a "passing reference" in dicta,[152] given that the court separately discussed the issue, found

---

[147] As noted in the Reactive Power Order, neither MISO nor any Owner with voting rights—including those who opposed the filing—has objected to how the vote was conducted.  *See id.* P 64.  Nor are we persuaded by Clean Energy Generation Owners' speculation that the proposal was not supported by a majority of eligible voters.  *See, e.g.*, Clean Energy Generation Owners Rehearing Request at 10-15.

[148] *See* Reactive Power Order, 182 FERC ¶ 61,033 at P 63.

[149] *Id.* (quoting *Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305, at PP 22, 24 (2008) (*MISO*), *aff'd in relevant part*, *Dynegy*, 633 F.3d at 1128-29) (internal quotation marks omitted)).

[150] Vistra Rehearing Request at 28.

[151] *Id.*

[152] *Id.*

the Commission's reasoning reasonable, and expressly upheld this determination.[153]  But, in any event, we affirm the previous reasoning on this point in *MISO* and reach the same conclusion here.

46.     We further conclude—consistent with the reasoning in the Reactive Power Order—that arguments asserting that accepting MISO TOs' proposal undermines generators' FPA section 205 filing rights[154] reflect a misunderstanding of how compensation is provided for reactive service in MISO.  Specifically, whatever rights interconnection customers (including independent power producers) may have to compensation for Reactive Service must be consistent with the terms of their GIAs.[155] Section 9.6.3 of the MISO *pro forma* GIA provides that such payments shall be "pursuant to any tariff or rate schedule filed by Transmission Provider and approved by the FERC."[156]  Thus, generators who have GIAs with this or a similar provision have agreed to make their compensation for reactive power contingent on the contents of Schedule 2, which MISO (and MISO TOs through Appendix K) have the right to revise through an FPA section 205 filing.[157]

47.     Prior to the Commission's acceptance of MISO TOs' proposal, Schedule 2 provided that the amount of such compensation for Reactive Service was determined by reference to generators' annual reactive power revenue requirements.[158]  MISO TOs' proposal altered Schedule 2—and only Schedule 2—to provide that "there will be no

---

[153] *Dynegy*, 633 F.3d at 1128-29 (rejecting petitioners' argument because that argument "would render the ISO's filing rights meaningless" and "the reference in § 3.9 to filings with 'regional impacts' would be redundant").

[154] *See* Vistra Rehearing Request at 27-29; AQN Wind Rehearing Request at 8-9; Clean Energy Generation Owners Rehearing Request at 18-20; REC Rehearing Request at 17-21.

[155] Reactive Power Order, 182 FERC ¶ 61,033 at PP 65-66.

[156] *Id.* P 65 & n.230.

[157] *Cf. supra* P 33 (explaining that arguments relating to reliance interests were unpersuasive given that compensation for Reactive Service under Schedule 2 has always been contingent on satisfaction of the comparability standard).

[158] *See* Transmittal, Ex. II, § III (explaining how the transmission provider shall calculate rates under Schedule 2; providing that the "charges collected under this Schedule 2 shall represent a pass through of costs, based on the annual cost-based revenue requirements or cost-based rates of those Qualified Generators providing service pursuant to this Schedule 2").

separate charge to compensate any generation resource for reactive service within the standard power factor range."[159]  In other words, MISO TOs' proposal did not adjust, overturn, or reduce to zero[160] any generator's annual revenue requirement for reactive power, but rather revised the Tariff such that those revenue requirements are no longer cross-referenced as the basis for determining the amount of compensation for Reactive Service.[161]

48.    Vistra argues that not all generation resources have agreed to section 9.6.3 of the MISO *pro forma* GIA.[162]  To the extent that individual generators have GIAs that provide an independent right to seek compensation for reactive service that is not pursuant to a rate schedule filed by the transmission provider (i.e., Schedule 2), MISO TOs' proposal does not affect their ability to seek such compensation.[163]  But we need not decide any issues concerning individual GIAs here; we find that Vistra's arguments pertaining to the reactive power compensation for those entities is beyond the scope of this proceeding, which is directed toward MISO TOs' proposal to eliminate reactive power compensation within the standard power factor range under Schedule 2.

49.    REC argues that the Commission has previously determined that a generator's rate schedule for reactive power compensation remains in effect absent a section 206 determination, and that, therefore, a section 206 proceeding changing that rate schedule

---

[159] *Id.*, Ex. II, § I.

[160] *See, e.g.*, Vistra Rehearing Request at 28 (asserting that MISO TOs' proposal "unilaterally adjust the reactive revenue requirements of unaffiliated generation resources to zero").

[161] Those revenue requirements are an "offer [to sell reactive service] on a generally applicable basis" at the stated rate, which do not establish an obligation on any party to purchase the service.  18 C.F.R. § 35.2(c)(1); *see Sw. Power Pool, Inc.*, 149 FERC ¶ 61,048, at P 106 (2014).  Under Order Nos. 2003 and 2003-A, Reactive Service is an obligation of interconnection for which no compensation need be provided, except as required by the comparability standard—and the decision to provide such compensation "rests with the transmission provider."  *Nevada Power*, 179 FERC ¶ 61,103 at P 20.

[162] Vistra Rehearing Request at 23-26.

[163] Our conclusion here is consistent with other cases in which we have recognized that generators could pursue claims that they have an independent contractual right to seek reactive power compensation.  *See PNM*, 178 FERC ¶ 61,088 at P 36; *E.ON*, 119 FERC ¶ 61,340 at PP 18-20.  We express no opinion here as to whether any such generator would be entitled to receive such compensation.

is required, for each generator, in order to eliminate compensation for Reactive Service.[164] In support, REC cites *MISO*, the MISO Order on Rehearing, and the Commission's brief in *Dynegy* in support of those orders.[165] In response, we note that our more recent precedent has not suggested that a section 206 action is required to terminate reactive power compensation within the standard power factor range.[166]

50.     Moreover, the Commission's reasoning in the earlier *MISO* and the MISO Order on Rehearing was that the transmission owners' FPA section 205 proposal to alter Schedule 2 (in that case, to create a new Schedule 2-A) could not invalidate generators' individual reactive service revenue requirements.[167] From there, the Commission in the MISO Order on Rehearing concluded that "transmission owners that switch to Schedule 2-A remain obligated to compensate generators in their zones pursuant to the generators' filed rate schedules unless and until those rate schedules are successfully challenged under section 206."[168] This conclusion, however, was reached without considering that a generator does not have such an entitlement to compensation except as provided under to Schedule 2, as the operative Tariff provision "pursuant to" which such compensation is provided per section 9.6.3 of the MISO *pro forma* GIA, as explained in our reasoning above.[169] Consistent with that reasoning and our more recent precedent, we therefore sustain the conclusion in the Reactive Power Order that a section 206 proceeding altering each generator's reactive power rate schedule is not required for MISO TOs to eliminate Schedule 2 compensation for Reactive Service.

---

[164] REC Rehearing Request at 22-25 (citing *MISO*, 122 FERC ¶ 61,305 at P 38; *Midwest ISO Transmission Owners*, 129 FERC ¶ 61,041, at P 30 (2009) (MISO Order on Rehearing); Brief of Respondent Federal Energy Regulatory Commission, *Dynegy Midwest Generation, LLC v. FERC*, Nos. 09-1306, 09-1308, 2010 WL 4569087 at 43 (filed Oct. 7, 2010) (FERC *Dynegy* Brief)).  We here cite the final version of the Commission's brief in *Dynegy*, rather than the page proof brief, which REC cites.

[165] *Id.*

[166] *PNM*, 178 FERC ¶ 61,088 at P 32.  We also note that REC concedes that the D.C. Circuit in *Dynegy* did not reach the question of whether a FPA section 206 action was required.  *See* REC Rehearing Request at 24 n.51.

[167] *See MISO*, 122 FERC ¶ 61,305 at PP 34, 37-38; MISO Order on Rehearing, 129 FERC ¶ 61,041 at P 30.

[168] MISO Order on Rehearing, 129 FERC ¶ 61,041 at P 30; FERC *Dynegy* Brief at 16-17, 40, 43 (reasoning that a two-step process was required by the FPA).

[169] *See supra* PP 46-47.

51.    Finally, REC also argues that section 9.6.3 of the MISO *pro forma* GIA states that payments for reactive power "shall be pursuant to any tariff or rate schedule filed by Transmission Provider and approved by the FERC" and that "Transmission Provider" is defined by the MISO *pro forma* GIA as MISO itself.[170]  Thus, REC claims, under section 9.6.3 of the MISO *pro forma* GIA, MISO TOs' changes to Schedule 2 cannot alter whether independent power producers receive compensation for reactive power.[171]  We disagree.  Although we are considering a proposal made by MISO TOs, that proposal revises the text of Schedule 2 of MISO's Tariff—the "tariff or rate schedule filed by the Transmission Provider" pursuant to which reactive power compensation is provided in MISO.  In addition, as we have already explained, MISO and MISO TOs share the same filing right for these purposes.[172]

### 4.    **Constitutional Arguments**

52.    In the Reactive Power Order, the Commission rejected Vistra's arguments that MISO TOs' proposal violates the Takings Clause and Due Process Clause of the Fifth Amendment to the United States Constitution,[173] and we are not persuaded by Vistra's arguments on rehearing that this conclusion was erroneous.[174]  At the outset, Vistra's focus on the "coerced nature of the 'obligation' to provide reactive power within a specified deadband"[175] is misplaced.  The obligation to provide Reactive Service exists independent of, and was not altered by, MISO TOs' proposal:  it was stated in Order No. 2003 and applies to individual generators through their GIAs.[176]  MISO TOs

---

[170] REC Rehearing Request at 10-11 (arguing that MISO TOs are separately identified as the "Transmission Owner").

[171] *See id.* at 9-16.

[172] *See supra* P 45.

[173] Reactive Power Order, 182 FERC ¶ 61,033 at P 62.

[174] Vistra Rehearing Request at 33-35.

[175] *Id.* at 34; *see also id.* (arguing that the conclusion that "generators have an 'obligation' to provide reactive power within a specified deadband . . . confirms the constitutional violation").

[176] *See, e.g.*, MISO, FERC Electric Tariff, attach. X, app. 6 (91.0.0), § 9.6.1 (governing power factor design criteria); *id.* § 9.6.2 ("Transmission Provider shall require Interconnection Customer to operate the Generating Facility to produce or absorb reactive power within the design limitations of the Generating Facility set forth in Article 9.6.1").  Similarly, as discussed above, where a generator's GIA is consistent with section 9.6.3 of the MISO *pro forma* GIA, that generator has agreed that its compensation for

proposed only to change the compensation for Reactive Service, eliminating a stream of revenue under Schedule 2.  We thus conclude that arguments that the obligation to provide Reactive Service is unconstitutional are impermissible collateral attacks on our prior determinations.

53.     The substance of Vistra's arguments on rehearing relating to the compensation afforded for Reactive Service are also not persuasive, as explained in the Reactive Power Order.[177]  Here, we further note that the function of generators' Reactive Service is to ensure that generators' real power can enter the transmission grid while maintaining system reliability.[178]  Moreover, MISO TOs' proposal simply terminates one schedule-created stream of revenue for such power—which the Commission had determined, under the comparability standard, is provided at the discretion of transmission owners. Generators also have the ability to pursue other mechanisms to receive compensation for the costs—if any—of providing Reactive Service capability, as discussed above. Vistra has not persuaded us that it has a property interest in continued Reactive Service compensation under the Tariff, nor that MISO TOs' proposal would unconstitutionally deprive generators of that putative property interest under the Takings Clause or Due Process Clause of the Fifth Amendment.

54.     We are also not convinced by Vistra's reliance on *Horne v. Department of Agriculture*.[179]  There, the Supreme Court distinguished *Ruckelshaus v. Monsanto Co.*,[180] which held that a requirement to disclose certain proprietary information to obtain a license to sell dangerous pesticides was not a taking, from the physical appropriation of raisins that could not "reasonably be characterized as part of a similar voluntary exchange" to achieve a government benefit.[181]  Here, the facts far more closely resemble

---

Reactive Service is contingent on the rate schedule filed by the transmission provider. *See supra* P 46. Generators may request that their GIAs be filed with the Commission unexecuted should they wish to contest the provisions of such GIAs.

[177] *See* Reactive Power Order, 182 FERC ¶ 61,033 at P 62.

[178] *See supra* PP 23-24 (also explaining that Reactive Service is not treated as a separate ancillary service as to which freestanding compensation is required, but is instead an obligation of good utility practice).  In addition, as noted above, compensation for Reactive Service has always been contingent on the comparability standard.

[179] 576 U.S. 350, 364-66 (2015); *see* Vistra Rehearing Request at 34.

[180] 467 U.S. 986 (1984).

[181] *Horne*, 576 U.S. at 365-66 (explaining that *Monsanto* could not be extended to treating "basic and familiar uses of property" as a government benefit).

*Monsanto.*  Generators are obligated, through their GIAs, to provide Reactive Service as a condition of interconnection to the transmission system so that they can sell real power, which their facilities exist for and are required to produce, without threatening system reliability.  This, too, reinforces that there is no unconstitutional taking or deprivation of property associated with MISO TOs' proposal.

## 5.    Remaining Issues

55.    We reject the remaining arguments that the Commission erred in issuing the Reactive Power Order.  Contrary to Clean Energy Generation Owners' claims,[182] MISO TOs did not predicate their proposal on the assertion that reactive support from generating resources is not needed and, in any event, the Commission's decision accepting that proposal does not rely on any finding to that effect.  Nor are we persuaded by Clean Energy Generation Owners' vague concerns that MISO TOs' proposal should have been rejected based on the possibility that it might affect stakeholder discussions on other issues.[183]  There is also no requirement that the Commission refrain from acting on MISO TOs' proposal or set MISO TOs' proposal for a hearing, as Wolverine and AQN Wind argue,[184] while it considers the issues in the generic proceeding in Docket No. RM22-2.[185]  Lastly, we sustain the Commission's decision to waive its 60-day prior notice requirement for the reasons stated in the Reactive Power Order.[186]

---

[182] Clean Energy Generation Owners Rehearing Request at 32-36.

[183] *Id.* at 41.

[184] *See* Wolverine Rehearing Request at 8; AQN Wind Rehearing Request at 10-11.

[185] *See Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 214, (1991) ("An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures . . . .  [A]n agency need not solve every problem before it in the same proceeding.").

[186] *See* Reactive Power Order, 182 FERC ¶ 61,033 at P 67 (finding that the elimination of Schedule 2 compensation would reduce charges to MISO's transmission customers).  Having found MISO TOs' proposal is just and reasonable, we are not persuaded by AQN Wind's argument that we should have declined to waive the 60-day notice requirement.  *See* AQN Wind Rehearing Request at 12.  Moreover, Clean Energy Generation Owners' argument that generators filing reactive power revenue requirements have not received such waivers, *see* Clean Energy Generation Owners Rehearing Request at 43-45, are also not well taken, given that such filings do not result in reduced rates and are, therefore, distinguishable.  *See Cent. Hudson Gas & Elec. Corp.*, 60 FERC ¶ 61,106,

Docket No. ER23-523-001                                                        - 35 -

<u>The Commission orders</u>:

In response to the requests for rehearing, the Reactive Power Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.  Commissioner Danly is dissenting with a separate statement attached.

( S E A L )


                                        Debbie-Anne A. Reese,
                                        Deputy Secretary.




_____

at 61,338 (1992) ("We will generally grant waiver of the 60-day prior notice requirement . . . [for] filings that reduce rates and charges—such as rate decreases . . . .").

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Midcontinent Independent System Operator, Inc.        Docket No.  ER23-523-001

(Issued July 12, 2023)

DANLY, Commissioner, *dissenting*:

1.      I dissented from the Commission order eliminating reactive power compensation because I disagreed that the MISO Transmission Owners (MISO TOs) had met their burden under section 205 of the Federal Power Act to demonstrate that their rate elimination proposal was just and reasonable given the record's substantial unrebutted evidence of the rate impacts this proposal would have on generators not affiliated with the MISO TOs.[1]  Nothing in the majority's order "addressing" rehearing changes my view.  Reactive power compensation cannot be eliminated absent the MISO TOs meeting this statutory burden.

      For these reasons, I respectfully dissent.

_____
James P. Danly
Commissioner

_____
[1] *Midcontinent Indep. Sys. Operator, Inc.*, 182 FERC ¶ 61,033 (2023) (Danly, Comm'r, dissenting).